PACE et al. v. STATE ex rel. RICE, ATTY. GEN., et al.

(In Banc. Oct. 13, 1941. Suggestion of Error Overruled Nov. 10, 1941.)

[4 So. (2d) 270. No. 34620.]

H. B. Greaves, of Canton, for appellants.

**G. B. Herring**, of Canton, for appellants.

Alexander & Satterfield, of Jackson, for appellee.

Greek L. Rice, Attorney-General, Geo. H. Ethridge, Assistant Attorney-General, Forrest B. Jackson, Morse, Bacon & Shands, and Green & Green, all for Jackson, for appellee.

Argued orally by **H. B. Greaves**, for appellants, and by **George H. Ethridge, Garner Green** and **James Alexander,** for appellee.

**McGehee, J.**, delivered the opinion of the court.

The questions presented for determination in this case are of very vital importance to the educable school children of every township in Mississippi wherein there is located a sixteenth section of land susceptible of development for the production of oil and gas in commercial quantities, since these minerals are now owned by the state in its sovereign and governmental capacity as trustee for the inhabitants of the townships under an obligation to utilize them for the support of the schools. The decision now reached by the court on the issues here in-

volved is also one which undertakes to adjudicate the rights of all holders of ninety-nine-year leases on such lands, herein denominated as agricultural or surface leases, as opposed to the rights claimed by the oil and gas companies under leases executed by various boards of supervisors, with the approval of the governor and attorney general, under the authority of Sections 6762 and 6763, Code of 1930, Chapter 318, Laws of 1926, by which such oil and gas lessees of the state are fully empowered to go upon these lands for the purpose of exploring for, drilling and removing any oil and gas to be found beneath the surface thereof, and in which leases a one-eighth royalty therein is reserved for the support of the schools of the respective townships.

It will therefore be readily seen that if numerous oil and gas fields should be discovered throughout the state equal to or greater in production than the "Tinsley Field" near which the particular sixteenth section now in controversy is alleged to be located, the far reaching effect of this decision cannot be estimated or foreseen.

Herein there is challenged the right of the state as trustee, suing by its attorney-general on behalf of the school children of the township as beneficiaries of the trust under which the state holds the title of these lands, and particularly Section 16, Township 11 North, Range 5 East, in Madison County, and also the right of the Stanolind Oil & Gas Company, appellees, (1) to have the title of the state and the rights of said lessee confirmed and quieted to the minerals under the surface thereof; (2) to determine and adjudicate the right of the oil and gas company to enter upon the land for the purpose of exploring for, drilling and removing the oil and gas therefrom in accordance with the terms of the lease now held by it; (3) to cancel as clouds upon the title of said minerals certain easement contracts and the oil and gas leases executed in favor of third persons by the agricultural or surface lessees; and (4) to enjoin the defendants named in the bill of complaint from interfering with the rights

of the complainants in the premises, so as to enable the state, as such trustee to obtain realization of the value of its one-eighth royalty and the oil and gas lessee to enjoy the rights vouchsafed to it, by the lease in question, and to thereby prevent this great store of wealth from being wasted or dissipated to the detriment of the school children of the township by means of wells on adjacent lands, upon the offer of the complainants to do equity by paying all such damages as may be inflicted upon the surface rights of the defendants by reason of the proposed operation, to be conducted in the usual and customary manner, the complainants disavowing any purpose to cause any irreparable injury by reason thereof.

It is alleged in the bill of complaint that each of the defendants are claiming the right to prevent the complainants from going upon that portion of the land, for the purposes aforesaid, on which each of those in possession own an agricultural or surface lease, executed under the Act of February 27, 1833, running for ninety-nine years from September 1847, and that they are claiming the right to prior compensation for any damages that may be sustained to their surface rights as a condition precedent to the right of the state to have said minerals developed as a source of revenue for the support of the cause of education in keeping with the trust under which the state now holds title to the same; that the defendants have no title or interest by virtue of their ninety-nine year leases or otherwise, either in the minerals or the royalties to be derived from the development thereof, and that if they are permitted to successfully assert such title or interest by means of the contracts whereby they have attempted to grant the exclusive right of ingress and egress to third persons and to lease the oil and gas rights for a one-eighth royalty reserved to themselves, their action in that behalf will serve to cast a doubt, cloud and suspicion upon the true title; that unless said easement contracts and leases are cancelled and the defendants enjoined from interfering with the right of the state and

its oil and gas lessee to enter upon the land and develop the same as prayed for, the reservoirs of oil and gas which have been stored up under the surface through the ages by the forces of nature will, because of the fugacious nature of such products, be drained by wells on adjacent lands and forever lost to the schools, so as to constitute waste as effectually as if removed by the defendants themselves, and in violation of the obligation of the surface lessees to return the land at the end of the term unimpaired by any permanent injury to the freehold; and that the defendants cannot, in view of their financial condition, be made to respond in damages adequate to compensate for the loss to be sustained by reason of the complainants being prevented from drilling for and removing these minerals pending the adjudication of such claims and demands that may be made by the defendants while wells are being drilled on adjacent lands.

It should be conceded at the outset of the discussion of the relative rights of the parties to this litigation that the holders of these agricultural or surface leases are entitled to be adequately compensated for any damages that may be sustained to their surface rights in the course of the exploration or development of the land for oil and gas; that for obvious reasons the extent of such damages cannot be properly ascertained and determined in advance of, and as a condition precedent to, the right of entry upon the premises, assuming, as we should, that the state is entitled to remove the minerals in question; that such damages are wholly uncertain and indefinite in amount, and will remain so until the extent of the exploration and development shall have been determined, and until which time their ascertainment, with such reasonable degree of certainty as would be fair and equitable to all parties concerned, is impossible, for the reason that in some instances the exploration for oil and gas would be limited from the very nature of the case to mere prospecting by geophysical and other methods short of drilling more than a few ''dry-holes'' in the woods, entailing only

slight damage to the possession and occupancy of the surface lessee, whereas, in other instances, if production of these minerals in commercial quantities is to be had, the number of wells, derricks, pipe-lines, storage tanks, rights-of-way, etc., may represent a development conducted on a scale so extensive as to greatly handicap, if not precluded, the use of any appreciable area of the land for agricultural purposes; and that the same rule of law announced in the case at bar is of course, to govern the rights of the state and its oil and gas lessees as related to those of the surface lessees on every sixteenth section in the state, comprising approximately one thirty-sixth of its entire area. It should also be conceded in this connection that in either instance the surface lessee may be remitted to his action at law for damages at such time as the amount thereof can be ascertained with such reasonable certainty as to fairly compensate him; that this court has already declared in the case of Moss v. Jourdan, 129 Miss. 598, 92 So. 689, that: "Where one person owns the surface of land and another the mineral therein and to remove the mineral will injure the surface, the owner of the mineral will not be enjoined from removing it at the instance of the owner of the surface, but the owner of the surface will be remitted to his action at law for damages unless the injury to the surface is irreparable"; that in the case before us no injury would be caused to the surface rights of a mere lessee of the land that cannot be compensated for, and that the state as absolute owner of the fee, in its capacity as trustee, is not objecting to the proposed operation, but seeks the right to have the same conducted on its own property, presently leased.

It should also be observed that this cause was heard by the court below only on the bill of complaint and the demurrers, and that this appeal is as granted upon the overruling of the demurrers, and to settle the controlling principles of the case; that no damages are claimed to have yet been sustained to the surface rights of the defendants, and they cannot be required to propound their

claim by means of a cross-bill for any damage that may be hereafter sustained unless they elect to do so before final decree; that they may be remitted to their action at law on that issue, after all of the equities existing in favor of the complainants are disposed of and the rights vouchsafed to them by a decree, sustaining the prayer of the bill, shall have been exercised; that the only issues before the chancellor when the interlocutory decree here appealed from was rendered were: (1) whether on the face of the bill of complaint the title of the state and its oil and gas lessee to the minerals involved should be confirmed and quieted; (2) whether the oil and gas contracts and leases executed by the surface lessees should be cancelled as clouds upon the title of the complainants; and (3) whether the defendants should be enjoined from preventing an entry upon the land under the authority conferred upon the complainants by Sections 6762 and 6763, Code of 1930, and by the lease executed in pursuance thereof as now held by the state's oil and gas lessee; that no entry upon the land is contemplated until the court shall have first determined upon a final hearing the issues above stated in favor of complainants, as the full measure of relief to which they were entitled at the time of the institution of this suit; and, it should be further observed that upon an affirmance of the decree now appealed from this court is vested with full authority to remand the cause to be finally disposed of as to the equities involved, and with the suggestion, if such should be considered requisite, that instead of the defendants being required to prematurely, or otherwise, assert their claims for damages by means of a cross-bill in the present suit they may be remitted to their action at law in that behalf, and especially in view of the fact that their damages will not have accrued until after the pleadings are settled in the instant case.

With these preliminary observations, which the writer thinks will be helpful, and which are to some extent necessary, to a clear understanding of the questions now con-

fronting the court when viewed in the light of what was said in the controlling opinion in the case of Gulf Refining Company v. Terry, 163 Miss. 869, 142 So. 457, which is urged by the appellants to be decisive of the issues here involved in their favor, we shall pass to a consideration of the main points in the case at bar, namely: (1) whether any title or interest in the minerals passed to the agricultural or surface lessees under the ninety-nine year leases executed by the township trustees on behalf of the state by authority of the Act of February 27, 1833, and which leases became effective in September, 1847, several years before any oil or gas field had been developed in America; (2) whether, if no title or interest did pass to said lessees, the township trustees had the power to waive or contract away the right of the sovereign state to later go upon the lands and utilize these minerals for the support of the township schools as beneficiaries of a trust which the state had pledged its sacred honor to faithfully administer, where no consideration was paid by the lessees on account of such minerals and they were not within the contemplation of the then contracting parties; (3) whether the enactment of Sections 6762 and 6763, Code of 1930, under which the lease held by the appellee Stanolind Oil & Gas Company was executed by the constituted authorities, was a valid exercise of the police power of the state in the discharge of the duty and responsibility to the public which the state owed to the cause of education, as trustee of the lands involved.

That the state acquired the title of these lands upon its creation out of a part of the territory ceded to the United States by the State of Georgia, as trustee for the inhabitants of the township, and for the support of the schools therein, was forever settled by the decision of this Court in the case of Jones v. Madison County, 72 Miss. 777, 18 So. 87, sustained by the authority of Long v. Brown, 4 Ala. 622; Gaines v. Nicholson, 9 How. 356, 13 L. Ed. 172; and Cooper v. Roberts, 18 How. 173, 15 L. Ed. 338.

That the state did not part with the title of any oil and gas when the ninety-nine year leases in question were executed, was likewise settled by the principle announced in the case of Moss Point Lumber Company v. Harrison County, 89 Miss. 448, 42 So. 290, 298, 873, when the court held that a ninety-nine year lease of a sixteenth section created, as between the state and the lessee, the mere relation of landlord and tenant; that it was of no greater dignity than a lease for one year.

In that case it was expressly said that "in no instance, however long may be the lease, can any right in the fee pass by a mere lease"; that "there is no authority given in the statute to do anything but lease this land"; that "no person reading this statute could possibly be misled into the supposition that he was getting a fee, when the statute said that it should be a lease, and when the conveyance made by the trustees only purported to be a lease"; that "a lease has an accurate, definite, certain legal meaning, and by this legal meaning the rights of the lessees under this statute must be measured"; and then to put the whole matter at rest the court further said that: "We state that the usual purposes for which lands are leased are agricultural purposes, and, unless the contrary be stipulated in the lease, the lease of the land carries with it only such rights as go with ordinary leases."

Moreover, every grant by the sovereign is construed most strongly against the grantee. Oil and gas, though remaining in place, is susceptible of distinct and separate ownership from the title of the land. Whatever is not unequivocally granted is deemed to be withheld in grants from the government, especially in conveyances of an estate less than the absolute fee, under the rule that nothing passes in such case but what is conveyed in clear and explicit language, inferences being resolved not against but for the government. 1 McAdam on Landlord and Tenant, Ambert, (5. Ed.), sec. 118; 5 Thompson on Real Property, Sec. 2861; Pearl Oyster Co. v. Heuston,

57 Wash. 553, 107 P. 349, 832, 135 Am. St. Rep. 1007; Wisconsin C. R. Co. v. United States, 164 U. S. 190, 17 S. Ct. 45, 41 L. Ed. 399; United States v. Oregon & C. R. Co., 164 U. S. 526, 17 S. Ct. 165, 41 L. Ed. 541.

Furthermore, the previous decisions of this court, holding that the title of the timber on these sixteenth sections of land did not pass to the ninety-nine year lessee (although not reserved by the terms of the lease) should be sufficient authority to sustain the view that the state still owns the minerals to be found beneath the surface. Warren County v. Gans, 80 Miss. 76, 31 So. 539. The necessity of obtaining the consent of the agricultural lessee to cut and remove the timber from this land is due to the fact that he is entitled to use such portion of it as may be needed for certain purposes. Since it was deemed necessary that the surface lessee should use some of the timber for estovers, clearing, fencing, and the building of houses needed to carry on his agricultural pursuits, there is greater reason to assume that it was intended that the timber should pass under such a lease, in the absence of a reservation to the contrary, than that a reservoir of oil or gas far beneath the surface, not possible to be utilized for agricultural purposes, and the existence of which was unknown to the parties, should have been thereby conveyed. Moreover, there is no principle of law better settled by the decisions and in the opinions of the text writers than that a fee owner in leasing land to a tenant does not part with the minerals under the soil, whether reserved by the very terms of the lease or not. Then, most assuredly, a mere trustee of the title cannot be assumed to have done so in violation of the trust and for no consideration paid.

Again, the rights of a tenant under a lease for a term of one or more years can be no greater than those vested in a tenant for life. It is settled beyond controversy with reference to coal mines that a life tenant has no interest in or right to open and work new mines not in operation at the time he becomes vested with the estate. To do so

amounts to the commission of waste, as a lasting injury to the inheritance, and equity will enjoin him from its commission. Bond v. Godsey, 99 Va. 564, 39 S. E. 216; Richmond Natural Gas Co. v. Davenport, 37 Ind. App. 25, 76 N. E. 525; Gaines v. Green Pond Iron Mineral Co., 32 N. J. Eq. 86; Marshall v. Mellon, 179 Pa. 371, 36 A. 201, 35 L. R. A. 816, 57 Am. St. Rep. 601.

In dealing with the right of the state to make an entry, it should be said that since the school trustees of the township did not convey the minerals when only leasing the land in 1847, the law will regard them as having been reserved. If reserved, then under the rule announced in Moss v. Jourdan, 129 Miss. 598, 92 So. 689, hereinbefore quoted from, the right of the owner to enter upon the land and remove them is clearly recognized, the court saying that in such case "the owner of the surface will be remitted to his action at law for damages unless the injury to the surface is irreparable." Also, in 10 Thompson on Real Property, p. 584, Section 5561, it is said: "As against the surface owner, the owner of the minerals has a right, without any express words of grant for the purpose to go upon the surface to drill wells to his underlying estate, and to occupy so much of the surface beyond the limits of his well or wells as may be necessary to operate his estate and to remove the product thereof. This is a right to be exercised with due regard to the rights of the owner of the surface, but, subject to this limitation, it is a right growing out of the contract of sale, the position of the stratum sold, and the impossibility of reaching it in any other manner." Applying this principle here, it may be said that while the state is not the purchaser of the minerals from the owner of the soil, with an implied right from the seller to go upon the land and take them, it is nevertheless the owner thereof, because of the impotency of its mere lease to convey them to the predecessors in title of the present agricultural or surface lessees. Again it was held in Chartiers Oil Co. v. Curtiss, 34 Ohio Cir. Ct. R. 106 (quoted with approval by

no less authority than 4 Summers Oil and Gas (Perm. Ed.), section 652, p. 3) and Chartiers Block Coal Co. v. Mellon, 152 Pa. 286, 25 A. 597, 18 L. R. A. 702, 34 Am. St. Rep. 645, that a right of access to the lower strata of the earth's crust is a property right, reserved by implication in a conveyance of the upper strata without an express reservation to that effect, but that such right is to be exercised with due regard to the owner of the surface, and that its exercise may be restrained within proper limits by a court of equity, if this becomes necessary. Then in the case of Magnolia Petroleum Company v. Price, 86 Okl. 105, 206 P. 1033, involving a controversy between the owner of an oil and gas lease and an agricultural lessee of public lands, it was held that the agricultural lessee was not entitled to the oil and gas, nor the royalties from the wells, but only to such damages as he may sustain to his agricultural lease by reason of the drilling operations for oil and gas.

In the case of Gulf Refining Co. v. Terry, 163 Miss. 869, 142 So. 457, 461, relied on by the appellants, the court took cognizance of the fact that the only case deciding the exact question before it was that of Kemmerer v. Midland Oil & Drilling Co., 8 Cir., 229 F. 872, and said that: "The majority of the court there held that the lessor of land for a term of years, in the absence of a provision in the lease to the contrary, has the right to enter upon the land and drill for oil and gas that may be [found] therein." Then our court adopted the contrary view as expressed in the dissenting opinion in the Kemmerer case. It does not therefore purport to be based upon any precedent decision so far as the point above mentioned is concerned, and should not be deemed decisive of the issues here involved for other reasons hereinafter mentioned.

But assuming that a private individual, firm or corporation, as absolute owner in fee of a tract of land, may by his implied covenant with the lessee thereof for quiet enjoyment be precluded from making an entry such as

would disturb the occupancy and possession of the lessee, because of the right and power held by such private owner in fee to either expressly or impliedly waive the privilege of entering upon the land during the life of the lease so as to interfere with the exclusive occupancy of the lessee, it would not follow that the school trustees of a township could preclude the state from the future exercise of its sovereign right to go upon this trust property for the purpose of conserving these natural resources in the interest of the public welfare, merely because of the failure to expressly reserve such right under the agricultural leases in question.

An attribute of sovereignty, such as the police power of the state, is not the subject of a waiver, barter, forfeiture or sale. It can neither be contracted away, nor nullified by legislation. It needs no constitutional sanction for its valid exercise; it is a power inherent in the existence of a government. Since the school trustees of the township were without power to waive the right of the state to go upon these lands in the future and utilize any source of revenue that may be derived from them not disposed of by these agricultural or surface leases, it was not essential that such right be expressly reserved therein, since there is necessarily reserved that which the grantor is without power to convey or contract away.

The application of the rule in the case at bar as announced in the case of Gulf Refining Co. v. Terry, supra, to the effect that a lessor may not later go upon the leased premises to remove minerals during the life of a lease unless the right to do so is reserved in the contract, is to disregard entirely the question of the state's sovereignty, and its right to exercise its said powers in a governmental capacity as distinguished from the discharge of corporate functions, a consideration to which the court did not address its attention in the Terry case, wherein the state was not a party to the litigation, and where no relief was sought for the stated purpose of enabling it to utilize in the interest of the public welfare the minerals sought to

804

be explored for in that case. Nor was the court there concerned with any issue raised by the pleadings involving the right of the state, as one of the contracting parties in a ninety-nine year agricultural lease, to prevent the other party thereto, or his assigns, from committing waste, defined in Moss Point Lumber Company v. Harrison County, supra, as "any substantial injury done to the inheritance," in violation of the covenant not to do so which is either expressed or implied in every lease contract; it being alleged in the instant case that the commission of such waste is being attempted through the expedient of keeping the state and its oil and gas lessee off the land until the reservoir of minerals shall have been withdrawn by wells on adjacent lands, and by the efforts of the agricultural lessees to convey to third persons the exclusive right of ingress and egress in order that they may produce and remove the oil and gas, owned by the state in trust for public purposes.

No decision concludes a point which is neither involved under the scope of the pleadings nor considered by the court. Lusk v. Seal, 129 Miss. 228, 91 So. 386; Adams v. Yazoo, etc., Railroad Company, 77 Miss. 194, 24 So. 200, 317, 28 So. 956, 60 L. R. A. 33. We are therefore not confronted with any difficulty because of the fact that the legislature has acquiesced in the law as announced in Gulf Refining Co. v. Terry, supra, by failing to enact further legislation to enable the state to assert its sovereign rights in the premises.

That the state cannot abdicate its duty as trustee of property in which the whole people are interested, any more than it can surrender its police powers in the administration of government and in the preservation of peace and order, is fully sustained by the following authorities: Illinois Central R. Co. v. Illinois, 146 U. S. 387, 459, 460, 13 S. Ct. 110, 120, 36 L. Ed. 1018; Rocky Point Oyster Co., Inc., v. Standard Oil Co., D. C., 265 F. 379; Chicago, Burlington & Quincy Railroad Co. v. State of Nebraska, 170 U. S. 57, 18 S. Ct. 513, 42 L. Ed. 948; St.

Anthony Falls Water-Power Co. v. St. Paul Water Commissioners, 168 U. S. 349, 372, 18 S. Ct. 157, 166, 42 L. Ed. 497, 506; Darling v. City of New Port News, 249 U. S. 540, 39 S. Ct. 371, 63 L. Ed. 759.

The issues involved in those cases and the holding of the court in each instance, are as follows:

In Illinois Central R. Co. v. Illinois, 146 U. S. 387, 13 S. Ct. 110, 118, 36 L. Ed. 1018, the State of Illinois, by act of its legislature, granted to the Illinois Central Railroad Company the submerged lands, constituting the bed of Lake Michigan and lying east of the tracks and break-water in the city of the Chicago for the distance of one mile, the grant providing the fee of the lands to be held by the Company in perpetuity without power in the company to grant, sell or convey the fee thereof. Thus the railroad company came into possession of the lake front and port facilities to the exclusion of the public, the state, and the City of Chicago. Later the state brought suit to set aside the grant and to confirm its title to the bed of Lake Michigan and its exclusive right to develop and improve the harbor of Chicago. The Supreme Court of the United States held that the State of Illinois, regardless of the grant, holds title to the lands under the navigable waters of Lake Michigan, within its limits, but the title is held in trust for the people of the state that they may enjoy the navigation of the waters, carry on commerce over them and have liberty of fishing therein freed from the obstruction or interference of private parties. In declaring the grant to the railroad company revoked, the Court said: "such abdication is not consistent with the exercise of that trust which requires the government of the state to preserve such waters for the use of the public. The trust devolving upon the state for the public, and which can only be discharged by the management and control of property in which the public has an interest, cannot be relinquished by a transfer of the property. The control of the state for the purposes of the trust can never be lost, except as to such parcels as are used in promoting

the interests of the public therein. . . . The state can no more abdicate its trust over property in which the whole people are interested . . . than it can abdicate its police powers in the administration of government and the preservation of the peace. . . . Any grant of the kind is necessarily revocable, and the exercise of the trust by which the property was held by the state can be resumed at any time.''

In Darling v. City of New Port News, 249 U. S. 540, 39 S. Ct. 371, 63 L. Ed. 759, the State of Virginia had leased to Darling for a period of twenty years the oyster beds under the tidal waters of Hampton Roads, the statute under which the lease was made and the lease both providing that he should have the exclusive right to occupy said lands and ''the state will guarantee the absolute right to the renter to continue to use and occupy the same for the period of twenty years.'' Code Va. 1904, Sec. 2137a. Later the State of Virginia granted the City of Newport News the right to discharge its sewage into such waters and Darling brought suit. After the cause had been passed upon by the Supreme Court of the State of Virginia (123 Va. 14, 96 S. E. 307, 3 A. L. R. 748) it was carried to the Supreme Court of the United States where the decision by the Virginia court was affirmed, the Court holding that the State of Virginia had the sovereign power and a public trust to use the tidal waters of Hampton Roads for the public benefits, one of which was for the discharge of sewage; that one exercise of its sovereignty, in the leasing of the oyster beds, did not exhaust the power of the sovereign and the lessee of the oyster beds took them subject to the right of the sovereign to again exercise the power consistent with its public trust and in accordance with changing circumstances and conditions.

In St. Anthony Falls Water-Power Co. v. Board of Water Commissioners of the City of St. Paul, 168 U. S. 349, 372, 18 S. Ct. 157, 166, 42 L. Ed. 497, 506, the territory of Minnesota, under authority of an Act of Congress approved February 26, 1857, had by lawful authority

granted a charter to the St. Anthony Falls Water Power Co. by which they were authorized to purchase and own lands and erect and construct buildings and do whatever might be necessary to harness the power of the water in the Mississippi River at St. Anthony Falls and were granted the right to so harness such water. After the expenditure of large sums in accordance with the charter by the power company, the legislature of the state of Minnesota authorized the City of St. Paul to divert a large quantity of the water from above the falls to the amount of about ten million gallons a day, which was distributed by the Board of Water Commissioners over the city for domestic and commercial purposes. The power company brought suit claiming their charter gave them a contractual right to the water which could not be taken from them except on payment of damages. The court, however, held that the charter rights of the power company were in reference to a matter over which the state of Minnesota exercised a sovereign power as trustee for the public and the grant in the power company charter could not operate as a contract but was subject at all times to the paramount right of the state as trustee for the public to divert a portion of the waters for public uses.

In Chicago, Burlington & Quincy Railroad Company v. State of Nebraska, 170 U. S. 57, 18 S. Ct. 513, 519, 42 L. Ed. 948, two railway companies and the City of Omaha had entered into a contract, whereby a viaduct should be constructed, each one paying a certain portion of its cost. The contract was made in accordance with legislative authority. Later the legislature passed an act by which the railway companies were required to pay the entire cost. The railway companies stood on their contract with the City of Omaha and claimed the new act unconstitutional in that it impaired the obligation of their said contract. The court, however, held that the contract dealt with a sovereign power, the power to protect health, safety, and welfare of the public and was subject to a subsequent exercise of its power by the sovereign. Par-

ticular attention should be given to that portion of the opinion where the court says: ''The presumption is that, when such contracts are entered into, it is with the knowledge that parties cannot, by making agreements on subjects involving the rights of the public, withdraw such subjects from the police power of the legislature.''

In Newton v. Mahoning County, 100 U. S. 548, 25 L. Ed. 710, the Ohio Legislature had passed an act providing that the county seat of Mahoning County should be permanently established at Canfield, upon the fulfillment of certain prescribed terms and conditions, which were fully complied with. The county seat was established accordingly and remained at Canfield for about thirty years. In 1874 the legislature passed another act, providing for its removal to Youngstown. It was complained that the last act was unconstitutional because it impaired the obligations of the contract for the permanent settlement of the county seat at Canfield. The court held, however, that this was a governmental matter in which the state exercised a sovereign power and the last act related to a public subject with respect to which the prior legislature had no power to bind a subsequent one.

The third question raised by the appellants is whether Sections 6762 and 6763, Code of 1930, under which appellees assert their right to go upon the land and drill for oil and gas, are unconstitutional, in that they authorize (1) a sale of these minerals in situ, as a part of the realty, and (2) that the lease may under its terms remain in force so long as oil and gas are produced on the land, and therefore perhaps for longer than twenty-five years, all in violation of Section 211 of the State Constitution which prohibits either a sale of any part of the sixteenth section lands, or a lease thereof for a period of more than twenty-five years.

Answering the first of these objections, it was held in the case of Dantzler Lumber Co. v. State, 97 Miss. 355, 53 So. 1, 2, involving the right of a board of supervisors to sell timber from these lands, that the framers of the con-

stitution ''were dealing with lands, nearly all of which were primarily agricultural lands, valuable only as such, and they intended to prevent the sale of the things out of which crops, annual or perennial, are produced. The word 'lands,' therefore, was used in that restricted sense in which it is so frequently used in common parlance, meaning, not the soil and everything above and below it, but simply the soil itself. The prohibition, therefore, extends only to the land, using the term in this restricted sense, and not to the timber growing on the land.'' Timber is much a part of the realty while standing and growing on the soil as are oil and gas while in place underneath it. If the legislature had the power to authorize the cutting and removal of timber growing on the land, and in its broadest sense constituting a part of the realty, it would likewise be able to provide for the withdrawal and disposition of minerals from beneath the surface.

The second objection is obviated by Section 2118, Code of 1930, providing that conveyances purporting to convey or pass a greater estate than the grantor may lawfully convey or pass, shall operate to pass such a right or estate as the grantor may lawfully convey. At most the lessee could only be prevented from asserting rights under such a lease after the expiration of the constitutional limitation of twenty-five years.

Finally, it may be said that since it is true under the decision of Moss v. Jourdan, hereinbefore cited, the owner of the surface may not enjoin the owners of the minerals from going on the land to remove the same, he would not be entitled to prevent them from doing so by force; and hence, the owners of the minerals would be entitled to injunctive relief to prevent any threatened interference with their rights in that behalf under the facts alleged in the present case.

The decision of the court below holding that the bill of complainant states a good cause of action for: (1) confirming the title of the complainants in the oil and gas upon said lands, (2) cancelling the oil and gas ease-

ment contracts and leases executed by the ninety-nine year agricultural or surface lessees, and (3) awarding the injunctive relief prayed for, should be affirmed. That court is vested with plenary power on a final hearing under the complainants' offer to do equity, and as a condition precedent to keeping the injunction in force, to make secure the rights of agricultural lessees and afford them an adequate remedy in equity, or at law if desired, to collect such damages as may be later sustained to their surface rights, and all in keeping with the spirit of said Sections 6762 and 6763 of the Code of 1930, authorizing the exploration and development of these lands for oil and gas upon such terms and conditions as may be deemed proper or advisable. The rules of evidence for the assessment of damages to property rights in this state are already well established, and the law-making power has had more than nine years since the decision in the Terry case to enact the additional legislation therein suggested, and no further action has been taken, either because of apathy and complacency or due to the belief that it was unnecessary in order to enable the state to exercise its attributes of sovereignty in the interest of the public good, a right which was not being asserted by the state in the case then before the court. At any rate, it would be contrary to every rule of reason to require that prior compensation be made to the surface lessees of their damages, as a condition precedent to the state's right to enter upon these lands to explore for, drill and remove these minerals, where it is known that the measure of such compensation cannot be ascertained until after the extent of such exploration and drilling operations shall have been determined, following such an entry. To require that whatever demands are made by the surface lessees shall be paid in advance, whether fair or exorbitant, or that they be first litigated through the courts, would be to defeat realization by the state of the value of its royalties in these minerals while they are being withdrawn by wells on the adjacent lands, and would be to deny the potency

of its governmental power to protect the interest of the beneficiaries of the trust involved, whose rights should be held paramount.

It has always been true at least in both England and America, and justly so, that the citizen is proud of, and has been zealous to defend, his legal rights, but often there come times when he must exercise even the higher duty and privilege of yielding his own conceptions of what his rights are under the law to the promotion of the ends of government and the demands of progress.

We do not mean to say that it would be a reasonable exercise of the sovereign power of the state, when seeking to utilize these minerals for the benefit of the township schools, that entries be made upon these lands, through its oil and gas lessees, in such manner as to interfere with any farming or other use to which the agricultural lessees are entitled to devote them, unless such sixteenth section is located within such proximity to some producing well on other lands as will afford reasonable ground to justify the belief that an exploration and drilling thereon would result in the discovery of such minerals in sufficient quantities to be of real benefit to the school children of the township, since the promotion of the public welfare in the utilization of the minerals for the good of the schools, and not the purely speculative results that might perhaps accrue, through what is termed in oil industry parlance as "wildcatting," is the sole object to be attained by the permitted interference with the occupancy and possession of the agricultural lessees. The bill of complaint now before us alleges facts justifying the right to explore and drill for oil and gas on the land in question, since there is some reasonable relation between that sought to be done and the governmental purpose to be served, and we confine the decision to the issues involved in the instant case.

To whatever extent the case of Gulf Refining Company v. Terry, hereinbefore discussed, may be deemed to be in conflict with the decision herein, we are of the opinion that it should be, and the same is, hereby overruled, for

the reason that if adhered to as controlling here, the result would be to deprive the township schools of any revenue to be derived from the development of the minerals underneath these sixteenth sections of land during the unexpired term of the ninety-nine year leases on the alleged ground that to allow the state to go upon the land would be to impair the contract rights of such lessees, and which impairment the legislature would be powerless to authorize by the additional legislation suggested in the Terry case; and because we are also of the opinion that the decision should not be followed for other reasons hereinbefore set forth.

Even though the state had the right to sell these lands in fee simple prior to the adoption of the Constitution of 1890, it did not do so; consequently it still owns both the land and the minerals, and its right to go upon the land and take the minerals should be sustained and enforced.

The decision of the court below in overruling the demurrers to the bill of complaint will therefore be affirmed, and the cause remanded.

Affirmed and remanded.

DISSENTING OPINION.

**Smith, C. J.,** delivered a partially dissenting opinion.

Two questions are here presented. (1) Has the state, or persons claiming under it, the right to enter this land over the objection of the lessees thereof, sink wells therein, and, in event oil or gas is discovered thereby to be in the land, to remove it therefrom; and (2) have the lessees of the land the right to remove and appropriate for commercial purposes oil or gas that may be found beneath the surface of the land? I concur in holding that the second question should be answered in the negative, under the law governing the relationship of landlord and tenant. I am also of the opinion that the first of these questions should also be answered in the negative. Such was the law until Gulf Refining Company v. Terry, 163 Miss. 869, 142 So. 457, was overruled a moment ago. That

case was maturely considered, and the controlling opinion therein fully expresses my views hereon. I can add nothing to what was there said, and what I shall now say is only for the purpose of showing the irrelevancy here of a legal principle that has for the first time been brought into this discussion, and to point out the uncertainty of the rights of the lessees of sixteenth section land under the decision just rendered.

The state's title to the sixteenth sections in the several townships rests upon a grant thereof from the Federal Government made pursuant to its agreement with the State of Georgia when the land in which the sections are situated was ceded to it by that state. Heretofore, under the decisions of this Court and of the U. S. Supreme Court, this grant vested in the state the absolute power to lease or sell any portion of the land, and if leased the rights of the state and the lessee therein were governed by the terms of the lease and the general law of landlord and tenant. The only obligation assumed by the state in accepting the grant was to devote it, or the revenue derived therefrom, or the proceeds of a sale thereof, to ''the support of schools within the'' township, and under leases of the character here under consideration, the lessees have ''the right to the exclusive possession and occupancy of every part of the land,'' and the state, the lessor, is without the right to enter thereon except when, under the law of landlord and tenant, it has the right so to do in order to prevent the commission of waste. Gulf Refining Company v. Terry, supra, is but one of many decisions of this court so holding, and not only that case but the many others holding that these leases conveyed to the lessees the right to the exclusive possession of the land have by the decision just rendered been overruled. The two opinions in the Terry case discussed every question that was then though to have any bearing thereon, but it now appears that the Judges in that case, and in many other prior cases, were mistaken in supposing that the relationship between the state and its lessees under these

leases was merely that of landlord and tenant for, as it now appears, the state acquired and deals with the land in its sovereign capacity under its police power, which power cannot be contracted away, in whole or in part, and therefore if the state should be held under these leases to have contracted away its right to enter a sixteenth section and remove minerals therefrom, that contract is not binding on it. If this is correct, the lessees of sixteenth section land have no rights therein except such as the state chooses to recognize, and in effect are but tenants thereof at the will of the state, for the holding cannot be limited to the right of the state to remove oil and gas from sixteenth section land which it has leased but applies to all of the relations created by the lease between the state and its lessee.

The history of this court's dealing with the rights of the state and its lessees under these ninety-nine year leases of sixteenth section land is quite interesting. Until the decision in Warren County v. Gans, 80 Miss. 76, 31 So. 539, more than sixty years after the state began to make these leases, no question was raised as to the right of the lessees to do what they pleased with the land, for, as was said by Judge CALHOON in the case of Moss Point Lumber Company v. Harrison County, 89 Miss. 448, 42 So. 290, 294, 873, "by universal understanding the lessee for 99 years of sixteenth-section lands acquired all of the rights of an owner in fee for the time." In the Gans case, supra, the court said this understanding of the rights of these lessees was wrong, and they were liable for the commission of waste—there the sale for commercial purposes of timber from the land. Four years after that case was decided, and the personnel of the court had changed the court held in Moss Point Lumber Company v. Harrison County, supra, that this universal understanding was correct, and the lessee of the land during the ninety-nine year period could deal with the land as the owner thereof except that at the end of that period the land reverted to the state. The court was then composed of three

Judges, one of whom dissented from the decision then rendered. The term of one of the two Judges who decided the case expired while a suggestion of error was pending therein. The Judge appointed to succeed him agreed with the Judge who dissented on the original hearing. The suggestion of error was then sustained and the court returned to the ruling of the Gans case, holding that while the lessees had the right to the exclusive possession and occupancy of the land, they were mere tenants thereof without the right to commit waste thereon. This holding was adhered to in many decisions, including Gulf Refining Company v. Terry, supra, in which case it is held that the state is without the right to interfere with the possession and occupancy of the lessee of a sixteenth section, holding under a lease of the character here in question, by entering it and boring for oil or gas that might be therein. That case, like the Moss Point Lumber Company case, supra, was decided by a divided court, and since it was decided, the personnel of the court has again changed, resulting in a majority of the Judges now saying that it was wrongly decided and should be overruled. If the past is any forecast of the future, it seems safe to predict that when the personnel of this court again changes, it will run true to form and overrule the decision just rendered.

Griffith, J., concurs in the foregoing opinion.