PIKE COUNTY *v.* BILBO.

(In Banc. Oct. 8, 1945. Suggestion of Error Overruled Nov. 12, 1945.)

[23 So. (2d) 530. No. 35947.]

Jas. A. Wiltshire, of Magnolia, for appellant.

Greek L. Rice, Attorney General, by W. B. Fontaine, Assistant Attorney General, for appellant.

**Satterfield, Ewing & Hedgepeth,** of Jackson, for appellee.

**Roach & Jones,** of McComb, for appellee, on suggestion of error.

Satterfield, Ewing & Hedgepeth, of Jackson, for appellee, on suggestion of error.

Greek L. Rice, Attorney General, by W. B. Fontaine, Assistant Attorney General for appellant, in response to request of Court.

Argued orally by **W. B. Fontaine,** for appellant, and by **John C. Satterfield,** for appellee.

**Roberds, J.,** delivered the opinion of the court.

This case involves the right and power of the supervisors of Pike County, Mississippi, to sell and convey the mineral rights and minerals in and under 135 acres of land located and included within Percy Quinn State Park, which park comprises an area of 1,653 acres in said county.

Section 6037, Code 1942, authorizes and empowers the supervisors of any county in this state to acquire, by

purchase or eminent domain, lands to be conveyed to the state for "State parks, forests, and other purposes, as herein provided," to pay for the same out of the general county fund, and, for that purpose, to levy a tax not to exceed one and a half mills on "all the property of the county," and to borrow money in anticipation of the collection of such taxes.

The supervisors of Pike County purchased the lands comprising said park and shortly thereafter conveyed them to the state, under authority of Section 6037 and other related sections, but in the conveyance the county reserved and retained unto itself all the oil, gas and other minerals in, and under said lands, as authorized by Section 6024, Code 1942.

The state constructed, and since then has maintained and operated, a state park on said area.

On April 6, 1945, said supervisors executed a conveyance to "all of the oil, gas and other minerals" on and under the 135 acres of said park-lands to appellee Bilbo, the consideration being the payment by grantee of $324 cash and retention by grantor of a royalty of 3/32 of 59c per "long ton" in all sulphur, and 3/32 royalty in all other minerals which might be later produced from said lands. The instrument provides that if the grantee Bilbo should thereafter execute a mineral lease on said lands the lease must require the lessee to pay Bilbo a royalty of ⅛ of all oil, gas and minrals which might be produced under the lease, of which the grantor-county will receive "¾ of said ⅛ royalty," but the county will not be entitled to any bonus money or delay rentals under such lease. The conveyance empowers Bilbo to effectively execute the lease or leases without the county joining therein or ratifying the same. But it was expressly agreed that the grantee should never be required to drill or operate for minerals on the lands conveyed, and that the development and operation on said lands for mineral purposes would be at the option and election of the grantee but if grantee did so elect to develop and operate, "that any wells or

mines discovered or drilled by the grantee may be abandoned or operated by him at any time at his election or discretion." However, the instrument recites that the 135 acres in question are a part of a block of approximately 7,500 acres in township 3, range 7, and that unless drilling operations are commenced somewhere on that block within one year of April 6, 1945, that all rights of grantee Bilbo, his assigns and grantees "shall immediately terminate and revert . . . " to Pike County.

On May 3, 1945, at a duly called special meeting, the supervisors, by resolution, set out that they were advised they had no authority or power to execute the foregoing conveyance, and directed that suit be brought to cancel the same. The bill herein was filed in accordance therewith, setting forth substantially the foregoing facts. Bilbo, by general demurrer, contended the bill was without equity on its face and stated no cause of action. The lower court sustained the demurrer, and the county declining to further plead, the bill was finally dismissed, from which decree the county appeals here.

If the board of supervisors possessed the legal power to enter into the contract and execute the instrument under consideration, the power must have been vested in it either by express statute or necessary implication. Jefferson County v. Grafton, 74 Miss. 435, 21 So. 247, 36 L. R. A. 798, 60 Am. St. Rep. 516; Adams v. First National Bank, 103 Miss. 744, 60 So. 770.

Did it have express authority? If so, it was by virtue of Section 2892, Code 1942, and that section alone. There is no other statute dealing with the subject. That statute authorizes the board of supervisors to sell and convey real estate of the county when it "shall cease to be used for county purposes." It is claimed by Bilbo, and denied by the county, that the 135 acres had ceased to be used for county purposes within the meaning of that statute, and that this fact met the condition prescribed by the statute and conferred upon the supervisors the power thereunder to enter into the contract and execute the

instrument here involved. The land before conveyance to the state was never actually used in any manner for county purposes. It was bought by the county with the intent and purpose of immediate conveyance to the state for a state park, and was so conveyed. In a sense, it is being used for county purposes now. Section 6038, Code 1942, provides that 75% of the gross revenue from state forests and parks shall be paid into the state treasury and 25% thereof shall be paid into the school fund of the county from which said revenue is derived. In other words, before the deed to the state there was no pretense of use by the county. Since that conveyance it has been used by the county as was contemplated in its purchase; therefore, it has not "ceased" to be used for county purposes within the meaning of Section 2892. And what was said above as to prior non-user applies also to the minerals.

Jefferson County v. Grafton, 74 Miss. 435, 21 So. 247, 248, 36 L. R. A. 798, 60 Am. St. Rep. 516, lends support to this conclusion. The Court, in holding, under the facts of that case, that the supervisors had no authority to sell lands which had been acquired for and used as a female academy and had ceased to be so used, stated that before the enactment of Section 304, Code 1892, Section 2892, Code 1942, the supervisors had no authority to sell county lands even though they had ceased to be used for public purposes using this expression ". . . being creatures of statute, endowed only with special powers, and created for special purposes, they can exercise only such powers as are expressly conferred by statute, or which are necessarily implied," and, quoting from West Carroll v. Gaddis, 34 La. Ann. 928: "They acquire for the benefit of the public—the people, particularly the local community which is represented primarily by the state, and secondarily by them, but so far only as the state has delegated to them the power to do so. As state auxiliaries, they cannot dispose of public property, unless with formal sanction of the state, and even then in those cases

only in which the state, violating no trust and no contract, and infringing the rights of no one, could herself legally act," saying further that "the course of judicial decision in this state holds them to the strictist limitations of their powers."

We do not think the situation confronting us brings this case within the requirements of Sections 2892 so as to give the board of supervisors express authority to make the sale and execute the conveyance in question.

Was the power so to do necessarily implied under the facts of this case? It is urged by appellee, with much force, that such power is necessarily implied because "Such gifts must be absolute, except for the reservation of any or all mineral rights . . . "; that the right to retain the minerals necessarily carries the power to sell and convey, else such minerals would be worthless to the county. It is pertinent, in considering this question, to have in mind the interrelated powers and duties and rights of Game and Fish Commission, the State Board of Park Supervisors, The State Forestry Commission, and the Board of Supervisors relative to lands acquired for park and forestry and game and fish propagation and protection, and the purposes of such acquisition. The power of the supervisors to acquire lands and pay therefor out of the public funds and levy a tax for such purpose, Section 6037, and the right of the Governor to accept deeds thereto for the state, and of the counties to retain the minerals in lands so conveyed, Section 6024, are found under Chapter 6, Reforestation, Code 1942. That chapter confers upon the Forestry Commission, through the State Forester, the duty and power to prevent and control forest fires, and the enforcement of all laws for protection of forest and woodland and water supply; to make and cause to be made studies and investigations of forest conditions, the propagation, protection, care and management of forests and trees and timber and by products thereof; to cooperate with the Federal Government and with individuals in the propagation of forests, and adopt

methods of encouraging interest and education on behalf of the public pertaining to state forests; to expand the funds appropriated by the legislature and received from the management of parks and forests. The Forestry Commission has control and management of all forests and public parks, with authority to issue grazing permits and leases on such parks and make sales of timber thereon, and the same section (6036) gives the Game and Fish Commission control and management of all lands set aside for fish and game refuge and preserves, and makes it the duty of the Forestry and Game Commission to cooperate in the utilization of lands dedicated under that Act for forestry and game and fish conservation purposes, ''and to do all things necessary and proper to obtain the most complete and advantageous developments of State forests, parks, and fish and game preserves.'' Seventy-five percent of the gross revenues derived from state forests and parks and from the game and fish refuges and preserves operated in conjunction with the Forestry Commission shall be paid the state, and twenty-five percent thereof shall be paid to the counties from which said revenues are derived. Section 6043 empowers the supervisors to pay the Forestry Commission not exceeding twenty-five percent of the forest severance tax. Chapter 2, Title 23, Code 1942, confers upon the Game and Fish Commission power to post refuges, sanctuaries for fish and game and regulate their uses, and Chapter 5, said Title 23, imposes upon the State Board of Park Supervisors, appointed by the State Forestry Commission, the duty to control, manage, operate and protect state parks. Section 5963 gives the supervisors of each county the power to donate from the general county funds not exceeding $2,000 each year for the establishment, maintenance and support of state parks located in that county. It is thus seen that the general purposes of the acquisition and operation of these lands are the health and recreation of the people of the state and the propagation and protection of game, fish and wildlife and the pres-

ervation of the timber, forests and waters thereof, to be used and enjoyed by the people generally under appropriate rules and regulations, and managed and controlled through the interrelated and co-operative powers and duties of the supervisors and the different commissions as above shown, and supported and maintained by taxation and the income from their operation.

Now, if the supervisors of the different counties in which these parks and forest reserves are located have the power to sell the under-earth thereof at their discretion, on such terms and conditions as they desire, it is evident there must result grave conflicts with the powers and duties of the other administering agencies. Moreover, these properties might be largely, if not entirely, rendered useless for the purposes created. For instance, in the case at bar, this instrument contains no restrictions upon the number of wells and the locations thereof for oil and gas, nor the number and size of excavations for other minerals, which may be made upon the granted lands in an effort to discover and utilize the oil, gas and minerals thereunder. Conceivably, the manner of this work might destroy the use of this park as such. Again, if the supervisors have the unlimited and unrestricted power to convey these minerals, there will be no uniformity among the counties in which these properties are located in the terms and provisions of the conveyances. This case illustrates that. Likely there will not be another deed with the same provisions as the one under consideration. By it the grantee is not obligated to execute an oil, gas and mineral lease, but if he does, the time of doing so and the terms and conditions of such lease are at his option. The grantee is expressly relieved of any obligation to drill or operate on the granted lands for the discovery or production of oil, gas and other minerals, ''and that all drilling operations and developments for oil, gas and other minerals before and after discovery shall be at grantee's option and election, and that any wells or mines discovered or drilled by the grantee may be abandoned or

operated by him at any time at his election or discretion." In other words, the revenue to the county from operation of the property is at the mercy of the grantee. Again, it is recited that the lands in controversy lie within a designated block of 7,500 acres, and it is provided that unless "drilling operations are commenced" somewhere on that block within one year the rights of Bilbo in the granted lands shall terminate. It is not shown that Bilbo owns any other leases or lands within that block. In other words, if a well is "commenced" by anyone anywhere on the 7,500 acre tract within one year, Bilbo has a fee simple grant with no obligation whatsoever to develop the property conveyed him.

We do not think that under these conditions the express right to reserve necessarily conferred the implied power to sell and convey the minerals under the lands in controversy.

It is a matter for the legislature to grant this power, if in its judgment that is best for the people, to be exercised under such limitations and uniformity as may be prescribed, conceding, but not deciding, that it has the power so to do.

The chancellor should have cancelled this conveyance, the county having offered in its bill to return the cash consideration. That decree will be entered here.

Reversed and judgment here for appellant.

### Dissenting Opinion.

**Alexander, J.,** delivered a dissenting opinion.

Our concern ought not to include the possibility of an abuse by the grantee of the privileges conferred by the mineral deed from the county. Such contingency is subject to control by the courts. See Pace v. State, 191 Miss. 780, 4 So. (2d) 270.

The only issue is the right of the county to execute a conveyance of property which it owns, but has never used

and does not expect to use. The realty interest here conveyed has more than "ceased to be used for county purposes"; it has never been so used. Nor is it exact to speak of it as being now so used. Nothing is being used by the state for park purposes except that which was conveyed to it, and the conveyance, under express authority of Section 6024, Code 1942, expressly reserves all minerals.

The statutory authority for the reservation of minerals must be given some meaning. If it does not by clear implication give the right to exploit the reserved minerals, the legislature must be convicted of deliberately creating a device by which the minerals may be severed from the land and perpetually impounded against any attempt to develop them.

Discussion of the improvidence of the conditions of the mineral deed is subordinate to and does not reach the heart of our sole inquiry: did the legislature authorize the reservation of minerals so that they might be used, or so that they might be guaranteed against use?

I am of the opinion that the county did what the legislature expected and athorized it to do.

**Griffith, J.,** concurs in this dissent.

ON SUGGESTION OF ERROR.

**Roberds, J.,** delivered the opinion of the court on suggestion of error.

Appellee suggests that we erred in our decision on the merits of this cause, and in not reversing and remanding it for further proceedings below.

We have again carefully considered the merits of the cause and are satisfied with our former conclusion thereon. The suggestion of error will, therefore, be overruled on this point.

However, we were in error in rendering a final decree here. We should have remanded the cause to the lower

court. The suggestion of error is well taken as to that. Therefore, the final judgment heretofore rendered will be set aside, and a judgment entered reversing and remanding the cause to the lower court for further proceedings not inconsistent with our original opinion herein.

The suggestion of error is overruled in part and sustained in part, and the cause is reversed.