WARREN COUNTY *v.* ALONZO P. GANS ET AL.

1. WASTE.  *Tenant for years.  Remainderman.  Timber trees.*

    A tenant for years who cuts standing timber for sale, and not for necessary estovers or for clearing so much of the estate as a prudent owner in fee would clear for cultivation, is guilty of waste.

2. SAME.  *Board of supervisors.  County.  Sixteenth sections.  Logs.  Replevin.  Code* 1892, §§ 290, 4144–4161.

    The board of supervisors may authorize (code 1892, § 290 and §§ 4144–4165), and the county can maintain, an action of replevin for logs cut for sale, and not for necessary estovers or for clearing so much of the land as a prudent owner in fee would clear for cultivation, from a sixteenth section leased, in 1834 for ninety-nine years, under the laws of this state authorizing the lease of sixteenth sections for school purposes.

FROM the circuit court of Warren county.

HON. OLIVER W. CATCHINGS, Special Judge.

Warren county, appellant, was the plaintiff in the court below; Gans and others, appellees, were defendants there. From a judgment in favor of the defendants the plaintiff appealed to the supreme court. The facts are stated in the opinion of the court.

*Magruder, Bryson & Dabney,* for appellant.

First. Appellant contends that the lessees had no right or authority, under their respective leases, to sell timber from the lands, and therefore the pretended sales to appellees were void, and gave no title to the logs.

Second. That if mistaken in the first contention, certainly said lessees could sell such timber only as it became necessary to remove, in order to clear as much of said land for cultivation as good husbandry might require, and that said tenants

far exceeded the limitations of the rule in the case of the logs in question, and having done so, it was waste, and the sales were void.

Third. Appellant contends further that the question of whether more trees were cut than good husbandry would require, was a question of fact for the jury, and it was therefore error for the court to grant a peremptory instruction for appellees.

The leases to the land in question were made under act of the legislature passed in February, 1833. See Laws 1833, p. 452. This act provides as follows:

"It shall be the duty of said trustee, on the final payment of the money which may be due, and not before, to convey the right, title, use, interest, and occupation of said sections, or such parts as may be leased to the lessee or lessees for and during and until the full end and term of 99 years."

Section 19 of the act of 1824 pertaining to school lands (see Laws of 1824, p. 17), provides as follows:

"The trustee aforesaid shall carefully and faithfully preserve school lands, and the timber thereon, from all improper waste, and shall institute suits in any court having competent jurisdiction, against any person, or persons, tenants as well as other who may be found damaging, in any manner, the lands, timber, or improvements, reserving to tenants the full liberty of their several leases."

The act first quoted, viz., that of 1833, does not in terms repeal the act of 1824, and does not appear to us to be inconsistent with the same, so that we take it that both of the acts quoted from were in force at the time these leases were made, and that the leases were accordingly subject to their terms and provisions.

The word "title," as used in the second act, was not intended to give any greater right in regard to the use and occupation of the land than the ordinary common law lease for a term of

years, and in fact to give it any broader meaning would be inconsistent with the other terms, viz., "right," "use," "interest and occupation." The fact is that the legislature had no power to authorize the sale of a greater interest. The title to the land was in the inhabitants of the township, and the legislature was powerless to divest them of it, as the state had no interest in the land except as such trustee. Construing this act with the section quoted from the act of 1824, it appears further that the legislature recognized the duty of protecting the lands from waste by a tenant or other person. Whatever rights the tenants may have to the use and occupation of the land, are such rights only as pertain to an ordinary lease for a term of years.

This being the case, the tenant had no right or interest to the growing timber on the land beyond the right to use the same for the building of houses and fences, and for fire wood, and had no right to destroy the same, except as such destruction became necessary for the purpose of clearing the land and preparing it for cultivation. The title to the timber was at all times in the person who owned the remainder, and not in the tenant. The tenants' only right was the right to use and enjoy the same, and not the right of ownership.

In this we do not deny the right of the lessee to appropriate a reasonable and proper porportion of the land for cultivation, and to that end to destroy the timber upon it, but we do deny that in the prosecution of such work he could convert the timber trees to his own use, except so much as became necessary for the proper fencing and housing of the land or for fire wood, and we contend further: That such trees as it became necessary to cut in order to improve the land, more than were necessary for the use of the tenant, as above stated, were the property of him who owned the remainder, and not of the tenant. Taylor on Landlord and Tenant (8th ed.), sec. 345; 28 Am. & Eng. Enc. Law (1st ed.), 870; *Clarke* v. *Holden,* 66 Am. Dec., 450; *Clemens* v. *Steer* (R. I.), 53 Am. Dec., 621; *Jones' Lee & Co.*

v. *Britton* (N. C.), 4 L. R. A., 178; *Brashear* v. *Macy,* 3 Marsh (Ky.), 89; *Buckley* v. *Dolbeare,* 7 Conn., 232; *Johnson* v. *Johnson,* 18 N. H., 594.

Some courts have held that where the tenant has the right to clear the land, and for that purpose to cut and remove the timber, that all timber so cut may be sold by the tenant.

These decisions are limited to few states, and appear not to be well considered, though they are quoted with approval in 28 Am. & Eng. Enc. Law (1st ed.), 871.

It will be observed, however, that there is no limitation put on the amount that may be sold, but the limitations are put upon cutting, which is what good husbandry demands. *Davis* v. *Gilliam,* 5 Ird. (N. C.), 309; *Davis* v. *Clark,* 40 Mo. App., 515; *Owens* v. *Hyde,* 6 Yerger (Ky.), 334.

The foregoing texts and decisions put three limitations upon the cutting of timber for sale from leased premises:

First. It must be for the purpose of clearing the land for cultivation.

Second. It must enhance the value of the inheritance or remainder, or at least not lessen the value; and,

Third. Sufficient trees must be left for the proper use of the remainder. All of these limitations are summed up in the term "good husbandry."

*Dabney & McCabe,* for appellees.

The lease of the land for ninety-nine years, which took place in 1834, was to all intents and purposes an out and out sale for ninety-nine years, and the lessees were to all intents and purposes the owners of the land, and had the right to settle on the land, make homes for themselves and their families thereon, the right to clear up the land, and in doing so to destroy the timber and burn or sell it, as they saw fit, and that, too, whether it was necessary to cut it for the purpose of clearing the land and putting it in cultivation or not. This theory is borne out by the surrounding conditions at that time. These sixteenth

sections were most of them nothing more or less than howling wildernesses. The very purpose of leasing them out for a period of ninety-nine years was to have them settled up by the farmers and planters of the country, and have them cleared up and put in cultivation and made profitable. If they were not leased for this purpose, the question is, what were they leased for? Was it expected that the lessee should lease them, build fences around them, and leave them there until the expiration of the ninety-nine years, or was it expected that they should pay out their money for the use of these lands? And if they paid out their money for the use of these lands, how were they to get the use except by clearing up the lands and putting them in cultivation? In the clearing of these lands it was necessary to destroy the timber that grew thereon, to cut it and burn it. In those times there was no market for timber, and of course when cut it had to be destroyed. Since that time markets have sprung up over the country, and the timber which was at that time worthless, may now be valuable. Certainly, the lessee, wishing to clear his land and put it in cultivation, is not bound to cut down the trees and burn them, when he may sell them and profit himself by the sale.

Terral, J., delivered the opinion of the court.

This is an action of replevin by Warren county to recover of the appellees 200 poplar logs, of the value of $4 each, and of the aggregate value of $800. This timber was cut from section 16 of township 15, range 3 E., of said county, leased (under legislative authority) in January, 1834, for ninety-nine years. The lessees or their assignees sold the timber while standing to appellees, the defendants below, who cut and felled the same. The two places (the Williams and Barstow places) from which the timber in controversy was cut were used as farms; and while, upon the evidence in the record, it appears probable that a portion of the timber sold to appellees, and cut by them, was sold by the tenants because they were about to

clear the land for cultivation, or because the trees impeded the cultivation of the fields already cleared and in cultivation, yet it is manifest that a portion of the trees were cut, not to remove them for immediate cultivation of the soil, but for the mere profit of the particular tenants. And such being the case, the peremptory instruction was error.

By the common law of England, "waste" is defined with great accuracy, and ancient statutes there have made tenants for years liable for waste. The doctrine has been adopted in this country so far as it is suitable to our condition and circumstances as a new and growing country, and, in a more or less modified form, is administered in most, if not all, of the states of the American Union. The rigid rule of the common law that a tenant of a particular estate could not cut timber, except for estovers only, is in many jurisdictions modified so as to allow him to cut off the timber for clearing so much of the estate as the needs of his family may require for their support, though the timber be destroyed thereby. And he may clear for cultivation such portions of it as a prudent owner in fee would clear. for that purpose, provided he leaves enough timber and wood as may be necessary for the permanent use and enjoyment of the inheritance. His right to open and clear for cultivation wild and uncultivated land is that of a prudent owner, having regard to its amelioration as an inheritance. When the particular tenant cuts timber in the process of clearing the land for immediate cultivation, he can appropriate it or its proceeds to his own benefit, but he cannot cut the timber for sale without making himself amenable for waste. When the timber is cut by the tenant or others unnecessarily or unlawfully, the right of the reversioner or remainderman at once attaches, and he may bring an action on the case in the nature of waste for his damages, or he may bring trover or replevin for the timber severed from the inheritance. Whether the tenant cut timber unnecessarily upon a claim of so doing for reasonable estovers or for the cultivation of the land, and whether

sufficient wood and timber were left for the permanent use of the inheritance, are questions for the decision of the jury. 4 Kent Comm., p. 76 *et seq.,* and notes; *Jackson* v. *Brownson,* 7 Johns., 232 (5 Am. Dec., 258); *Mooers* v. *Wait,* 3 Wend., 104 (20 Am. Dec., 667). These views of waste we regard as just and reasonable.

*The judgment below is reversed, and the case is remanded.*