Dodds *v.* Sixteenth Section Development Corp.
Greaves, et al. *v.* Sixteenth Section Development Corp.

Nos. 40740, 40741 January 20, 1958 99 So. 2d 897

Barron C. Ricketts, Avery & Putnam, Ernest Shelton, Joe T. Patterson, Atty. Gen., Jackson, for appellants.

*Watkins & Eager, Watkins, Edwards & Ludlam, Green, Green & Cheney,* Jackson, for appellee.

ARRINGTON, J.

These two cases were consolidated as both involve a lease of Section 16, Township 6, Range 1 East, Hinds County, Mississippi. In Cause No. 40,740, Sixteenth Section Development Corporation, hereinafter referred to as Development Corporation, filed its bill in the Chancery Court of the First Judicial District of Hinds County to confirm a lease executed by the Board of Supervisors to it on June 21, 1957, for a term of twenty-five years. The chancellor confirmed the lease and the defendants appeal.

The Development Corporation is a non-profit corporation organized under the laws of the State of Mississippi. The incorporators include the Board of Supervisors of Hinds County, the Superintendent of Education of Hinds County, the Presidents of the three Jackson Banks, and Bishop Duncan M. Gray. The purpose for which it is created is:

"To operate and function as a civic improvement corporation, and more particularly to provide, own, hold, maintain, control, operate and manage a recreational park or parks with a lake or lakes for fishing, swimming, boating, water skiing and related activities in the County

of Hinds Mississippi, for the benefit of the people of Hinds County and the general public; to render more productive in revenue to the sixteenth section school land fund of Hinds County, Mississippi, the land upon which said lake or lakes are located; and to promote in Hinds County the conservation and fullest beneficial use of the water resources of the State of Mississippi by providing for the further and additional beneficial use and disposition of the water in and from such lake or lakes as is permitted by law and not inconsistent with the other objects of the Corporation.''

The charter of the Development Corporation provides, in part, as follows:

''No dividends or profits shall ever be paid or divided among said members. All revenues for any fiscal year in excess of operation and maintenance expenses, principal, and interest payments on bonds, notes and other indebtedness and appropriate reserve and contingent fund requirments shall be contributed and paid to the proper township sixteenth section school land fund or funds of Hinds County, Mississippi, as provided by law. No member shall have or ever acquire any individaul or personal rights or interest in the assets of the corporation.''

The record discloses that proper order was entered authorizing the President of the Board to execute to the Development Corporation a twenty-five year lease covering approximately 400 acres of Section 16, Township 6, Range 1 East, Hinds County, for an annual ground rental of $8,000. On July 9, 1957, the Development Corporation entered into a lease contract with the Mississippi Power & Light Company, hereinafter referred to as Power Company, which lease contract was made an exhibit to the bill of complaint. Under this contract, the Development Corporation agreed to construct a reservoir in accordance with plans and specifications prepared by Michael Baker, Jr., Inc., It authorized the Power Com-

pany to use the water in its Rex Brown Steam Electric Generating Plant for cooling purposes. In order to build the reservoir, the Development Corporation planned to issue bonds in the amount of $1,500,000, which amount would be used to construct the reservoir and a water line to Pearl River and in equipping its pumping station. The Power Company agreed to pay the Development Corporation $143,845.20 annually at the rate of $11,989.60 per month for the use of said water. The Power Company guaranteed sufficient payments to meet the annual payments of principal and interest due on bonds, the annual ground rental of the Development Corporation to Hinds County in the amount of $8,000, and all ad valorem taxes upon the leasehold interest and improvements placed on the land. The Power Company was to have paramount rights to use of the water.

The Devolopment Corporation submitted the project to the Mississippi Board of Water Commissioners and on June 11, 1957, the Board entered an order approving and authorizing the Development Corporation to withdraw one and one-half billion gallons of water per year from Pearl River at a rate not to exceed 6.48 million gallons per day for use in the said reservoir. The Chairman of the Board of Water Commissioners testified that he personally approved the reservoir as a water conservation measure; that it will preserve water which would otherwise be lost and help relieve the water situation in the vicinity of Jackson; that the reservoir would have a value many times its present value at the end of the present lease.

The record further discloses that the Power Company is now increasing the size of its Rex Brown Generating Plant and will expend over $25,000,000 for such improvements, and that it had planned to use under ground water and cooling towers, the same as is now being used at the present plant.

The chief engineer for the Board of Water Commissioners testified that he approved the project as it would

conserve the water supply. Arthur C. Miller, Vice-president of Michael Baker, Jr., Inc., an internationally known engineering firm, testified that the plans and specifications for the reservoir were prepared under his supervision; that they were approved by the engineers at the home office of the company; that the firm consulted with Dr. Fred Kellogg, Dean of Engineering at the University of Mississippi and an internationally known expert on soil mechanics, and that he approved the plan. Miller further testified that the reservoir would be safe and would contain approximately one and three-fourths billion gallons of water; that the use of the water by the Power Company will not interfere with the use for recreational purposes; that there will be 2-3/4 miles of shore line for recreational development on the north side of the lake. In addition, it will have two miles of shore line along the levee which will not be usable; that there is no danger of the dam breaking; that the circulation and addition of new water will prevent stagnation in the reservoir; that the reservoir will not create fog any more than any other body of water; and that in his opinion, fish would be able to live in the reservoir; that the plan was to completely fence all portions of the dam except the area on the north portion; that the lake will cover a part of the Livingston Road and the maximum increased distance that anyone would have to travel by reason of this would be one-half mile. As to other benefits, he testified that the construction of the reservoir would reduce the flood condition in Jackson from Eubanks Creek, also that in an emergency the reservoir could provide the City of Jackson with water; that the reconversion of the reservoir would present no engineering problem and could be reconverted at a cost of approximately $50,000.

J. E. Aldridge, Superintendent of Education of Hinds County, testified that after making a study of the proposed project, he recommended that the Board of Supervisors execute the lease; that the lands leased to the Development Corporation for an annual ground rental of

$8,000 produced only $1294.23 for the Township School Fund for the preceding year. He further testified that about twenty years ago a lake was constructed on Sixteenth Section land near Edwards, Mississippi, and this section now produces an annual revenue for the school fund of approximately $225 per year; that another lake was constructed in 1956 on sixteenth section land in Township 5, Range 1 west, and leased to the Employee's Recreational Club of United Gas Corporation, which lease comprises approximately 168 acres for an annual rental of $700; that the construction of this project will result in increased revenue and that in his opinion the reservoir will have a vastly increased value at the end of the present lease.

Upon this evidence, the chancellor confirmed the lease, beginning on June 21, 1957 and terminating on June 20, 1982.

In Cause No. 40,741, Patrick J. Maloney and others filed bill in the Chancery Court of the First Judicial District of Hinds County seeking to enjoin the construction of the proposed reservoir, contending that if the Development Corporation is permitted to complete or commence the construction of this project it would destroy the identity of the land and will do lasting, permanent and irremediable injury to the land and the reversionary interest, and would if permitted constitute actual and commissive waste as defined by law.

The defendants answered and denied that the work contemplated would destroy the land and would show that in addition to the $8,000 a year minimum rent for the next twenty-five years, which was vastly more than said lands have ever produced as rental into the school fund, the defendants propose to place improvements on said lands which will cost over $1,000,000, at no risk or expense to Hinds County or the township school funds.

The appellant Patrick J. Maloney testified that he objected to the proposed construction on the grounds that they were making a change in the land and that he

was not referring to the value of the land at the end of the twenty-five year lease. John S. Virden's testimony was to the same effect.

Arthur C. Miller testified as to the details of the construction of the reservoir, that he was personally familiar with the land in this sixteenth section; that this land had formerly been used for agricultural purposes; that the average depth of the water in the reservoir would be fifteen feet, and a maximum of about thirty feet; that there is no timber on the land; that in constructing the reservoir the top soil will be removed and retained for the purpose of placing it back on the levee in order to grow grass. He also brought out the fact that a canal which would vary from 20 feet to approximately 300 feet in width and about three-fourths of a mile in length would run from a discharge outlet from the Power Company in a northeasterly direction to a point near the northeast corner of the lake, and he repeated that the reservoir could be reconverted in more or less its original state at an estimated cost of $50,000.

Ross Dodds, President of the Board of Supervisors of Hinds County, called as an adverse witness, testified that he was of the opinion that this reservoir was for the best interest of Hinds County and that it was a good lease.

With this testimony the appellants rested, and the appellee offered in evidence by agreement the transcript of testimony in Cause No. 40,740, subject to certain specific objections by the appellants.

The chairman of the Board of Water Commissioners testified to the same effect as in the former case. Dr. Frederick H. Kellogg, Dean of Engineering at the University of Mississippi, testified that he served as consultant in the preparation of the plans and specifications and that they were both feasible and adequate from an engineering point of view. An expert on real estate appraisal testified that he had made a study of the plans

and specifications for the proposed reservoir, the lease, and the contract between the Development Corporation and the Power Company; that the capitalized value of Hinds County's interest in the land leased upon the completion of the proposed improvements would amount to approximately $1290 per acre, whereas the present capitalized value of said land without the improvements is only $77.72 per acre; and that without a doubt the proposed development of the sixteenth section land constituted the highest and best use to which the land could be put by Hinds County for the benefit of the school fund. He also testified that he was familiar with the improvements that are being constructed by the Power Company adjacent to this property, and that the expenditure will be in excess of $25,000,000; that the Power Company depreciates their plants over a period of 40 years, and the water will have an industrial value for a period of 15 years beyond the expiration of the lease; that the proposed project will keep a substantial amount of land intact for such use as the county deems appropriate 25 years from now, and this is one of the most valuable assets of the proposed project.

Mr. William E. Mallett, a civil engineer, testified in rebuttal that he had experience in land usage in connection with city planning and that he had studied the plans and specifications of this project; that in his opinion, it would cost $450,000 to replace the earth in substantially its original condition after the reservoir is built; that in his opinion residential and industrial usage would constitute the highest and best use.

The court declined to issue the injunctions and dismissed the bill of complaint, from which decree the defendants appeal.

 The main assignment argued is that the proposed use of the lands involved constitutes waste. One of the leading cases in this State on this question is Moss Point Lumber Company v. Harrison County, 89 Miss.

448, 42 So. 290. In this case, the predecessors in title of the Moss Point Lumber Company obtained a 99-year lease from Harrison County for a total consideration of $835.00. It was conceded that the only value of this land was its timber, as it was unsuitable for cultivation. The Board of Supervisors of Harrison County brought suit to enjoin the lumber company from cutting the timber off the land. The Court held that to remove the timber from the land would constitute a destruction of the entire value of the land and upheld the county's right to enjoin such action as constituting waste. On the question of what constituted waste, the Court said:

"The next question which we will consider is the question of what constitutes waste. Waste is defined to be any substantial injury done to the inheritance, by one having a limited estate, during the continuance of his estate. By universality of authority the cutting of timber for commercial purposes by a tenant for years is waste. We may safely say that there are hardly any authorities to be found in conflict with this statement. 1 Tiffany, sec. 249, p. 564; Warren County v. Gans, 80 Miss. 76 (s.c., 31 South. Rep., 539); Taylor on Landlord and Tenant, sec. 353, p. 271; Tiedeman on Real Property, sec. 69; Lester v. Young, 14 R. I., 579; Davis v. Clark, 40 Mo. App., 515; Smith v. Smith, 105 Ga., 106 (31 S. E., 135); Davis v. Gilliam, 40 N. C. 308; 1 Washburn on Real Property, secs. 275, 276; Proffitt v. Henderson, 29 Mo. 325. . . . . . .

"What rights have tenants for years? The answer to this question can be placed in no better language, or more accurate expression, than the rule laid down in the Gans case, supra: 'The rigid rule of the common law that a tenant of a particular state could not cut timber, except for estovers only, is in many jurisdictions modified, so as to allow him to cut off timber for clearing so much of the estate as the needs of his family may require for their support, though the timber be destroyed

thereby. And he may clear for cultivation such portions of it as a prudent owner in fee would clear for that purpose, provided he leaves enough timber and wood as may be necessary for the permanent use and enjoyment of the inheritance. His right to open and clear for cultivation wild and uncultivated land is that of a prudent owner, having regard to its amelioration as an inheritance. When the particular tenant cuts timber in the process of clearing the land for immediate cultivation, he can appropriate it or its proceeds to his own benefit; but he cannot cut the timber for sale without making himself amenable for waste. When the timber is cut by the tenant or others unnecessarily or unlawfully, the right of the reversioner or remainderman at once attaches, and he may bring an action on the case in the nature of waste for his damages, or he may bring trover or replevin for the timber severed from the inheritance.' The rule announced in the Gans case is but an affirmation of settled authority. What constitutes waste is determined by the consideration as to whether or not the act done results in injury to the inheritance. 1 Tiffany, sec. 247. In the original opinion it is held that 'twenty years' growth is held to constitute timber. Who can say, therefore, in this case, that the interests of those who will come after will be harmed by removing the timber?' Courts do not undertake to deal with speculations of this kind, or reckon with possibilities. They are confined to legal rights, which exist at the time they are called to act on them. Whether or not an act on the part of the tenant is waste is determined by the facts and conditions which exist at the time the act is committed.''

The appellants contend that the construction of the lake on the land formerly used for agricultural purposes, thereby changing it from its former use, under the law constitutes waste. Under the English law, clearly this would be waste, as there an act would constitute waste if any change be made even though the results increased

or enhanced the value of the inheritance. However, the Court in the case of Canon v. Barry, 59 Miss. 289, refused to follow the English rule as to waste, and said:

"When the defendant took possession, the arable portion was in such condition that it was wholly unproductive for the first year thereafter. By rebuilding the fences, clearing thirty or forty acres additional, removing some of the tenants' cabins to other locations, and building several new ones, he has brought up the rental value of the place to something less than three hundred dollars per annum, exclusive of the amounts expended each year in making these improvements. In accomplishing these results, he has freely cut and used the growing timber on the place, of which there is a superabundance for this and all other purposes. In so doing, as well as in removing the cabins, and perhaps in other respects, he has unquestionably been guilty of that which would be deemed waste under the English authorities, but which we cannot pronounce to be such under the state of things existing with us, and under the circumstances of this case. The condition of this country and that of England are wholly dissimilar, and that which would be a safe test there is altogether inapplicable here. With us, speaking generally, it may be said that nothing will ordinarily be held to constitute waste which is dictated by good husbandry, and promotes rather than diminishes the permanent value of the property as an estate of inheritance. That such has been the nature and effect, in the main, of the acts of the defendant, is incontestably established by the testimony in the case."

The Court, in Moss Point Lumber Co. v. Harrison County, supra, quoted with approval from the case of Davis v. Gilliam, 40 N. C. 310, which held that it was not waste to cut timber and construct embankments and ditches which increased the value of the inheritance. There the Court said:

"It is certainly proper, in cases of this kind, to have a view to the spirit and reason of the common law; and

therefore many things that constitute waste in England, and may hereafter do so here, because prejudicial to the inheritance, ought not to be so held here at present, because they do not prejudice, but rather improve, the inheritance. Hence, turning woodland into arable, though the timber felled be sold, is not absolutely waste in our law; for cutting timber on land fit for cultivation, or that may be made so, and reducing it to that state, may, in the condition of our country, be a benefit, rather than an injury, to the reversioner. If this swamp be of the fertile quality, it might add greatly to the value of the inheritance to take off the whole of the timber, if the tenant would go on by embankments and ditches to prepare the land for crops. The rules, therefore, of the common law, determining what is or is not waste, are not entirely applicable to the condition of things here. But the principle on which these rules were formed applies here, as, indeed, it does everywhere; for it is founded in the nature of justice itself. It is that a tenant for a limited period, or a particular estate, cannot rightfully so treat the estate as to destroy the value of the reversioner, or materially reduce it below what it should be; regard being had merely to the postponement of the enjoyment. The tenant may use the estate, but not so as to take from it its intrinsic worth.''

Judge Whitfield, in his concurring opinion, emphasized the small amount—$835—which was paid for the lease and that the cutting of the timber on the land would destroy its only value—''the whole value of the inheritance.'' He also emphasized that a lessee should be allowed the widest possible range in the use of the leased premises as long as the value of the inheritance is protected, and said: ''The widest possible range of dealing may be allowed the lessee, the widest usage and freest treatment of the subject matter of the lease, provided, always, that the value of the inheritance in the thing leased shall not receive lasting damage.''

On the question of waste with reference to commercial use rather than agricultural, he pointed out that where sixteenth sections are in or near cities, the value of the inheritance is increased by the use of said lands for commercial rather than agricultural purposes, and said:

"In one word, whatever inflicts lasting damage upon the inheritance is waste in all jurisdictions, here and in England. Of course, where all the timber is cut off and a town built on a sixteenth section, as in the case of the City of Columbus, the inheritance is benefited, and not damaged, and there is no waste in such case. That which benefits the inheritance can never be waste. Such instances present cases of 'meliorating waste.' In the very nature of things this must be the only correct rule, and it will be kept in mind, in this connection, that the demurrer admits in this case, that the whole value of the inheritance was being destroyed by the lessee for years."

 We are of the opinion that in the light of the above authorities and under the facts heretofore stated, the construction of the lake is not waste. There is no taking or removing of the soil from the premises, but only the removing thereof to make a levee, which, under the facts of this case, is a benefit to the inheritance.

The title to sixteenth section lands is in the State as trustee for the inhabitants of the township and for the support of the schools therein. Section 211 of the Constitution of 1890 prohibits these lands from being sold and provides that the legislature shall enact laws for the leasing of said lands. In the section involved here, 140 acres lies within the corporate limits of the City of Jackson. The lease in question was executed by the Board of Supervisors under the authority of Sections 6597-02 and 6597-04, Mississippi Code of 1942, as amended. These sections provide:

"6597-02. Lease for ground rental—uncleared lands —sale of lieu lands situated outside of county.—The board of supervisors of the county in which sixteenth

section lands are situated may, in its discretion, elect to lease any of such lands, whether within or without the municipality, for a term not exceeding twenty-five (25) years for a ground rental, payable annually, and in the case of uncleared lands, may lease them for such short terms as may be deemed proper in consideration of the improvement thereof, with the right thereafter to lease for a term or to hold on payment of a ground rental; provided, however, that land granted in lieu of sixteenth section lands in this state and situated outside of the county holding or owning the same, may be sold and the proceeds from such sale may be invested in the manner prescribed by law.''

''6597-04. Appraisal of lands situated in municipality to fix rental.—When any such lands are situated in a municipality and the same become subject to lease the board of supervisors shall appoint three (3) disinterested freeholders of the county to be appraisers, whose duty it shall be to appraise and report to the board their recommendations for a gross sum to be paid should the land be leased for ninety-nine (99) years, or the annual ground rental to be paid should the land be leased for a term of twenty-five (25) years. The board shall determine whether the same be a reasonable amount, subject to appeal to the circuit court by any person interested, provided that the holder of any leasehold of such lands at the date of the expiration of such lease hold shall have a prior right for a period of ninety (90) days from such expiration in which to renew his lease.''

 Under the statute, no limitation is placed on the use to which the lessee may make of such lands. It is a matter of common knowledge that many towns and cities are built on sixteenth section lands, as well as factories, railroad lines, and other businesses. In Hinds County, the record discloses that three lakes have been constructed on sixteenth section lands, one of approximately 40 acres, one of approximately 78 acres,

and one by the Filtrol Corporation immediately south of Jackson.

■■ ■ Appellants further argue that since the lands leased were formerly used almost exclusively for agricultural purposes, it would be unlawful to construct the proposed lake, and that said lands should be used for commercial and residential purposes. Although 140 acres of this section is within the City of Jackson subject to a 99-year lease, there has been no development; neither has there been on the remainder of the land subject to a 25-year lease. It may be that since Section 211 of the Constitution prohibits the sale of these lands, the public is reluctant to build homes or other commercial establishments without title to the land. Under the circumstances in this case, we do not think that this land should be forever condemned for agricultural purposes providing for an annual rate of only $1294.43, when under the proposed use it will bring an annual minimum rate of $8,000 for a period of twenty-five years, plus all profits realized on the development. To hold otherwise would thwart the purpose of Section 211 of the Constitution, which contemplates that the land be used to produce revenue for school purposes. ■■ ■ It is a matter of common knowledge that for the past 140 years, with possibly a few exceptions since the discovery of oil and gas, sixteenth section lands have produced little revenue for the school funds. See Mississippi Constitutions, Ethridge, Sec. 211, Constitution of 1890, page 382.

The chancellor heard the evidence and made specific findings of fact which were incorporated in the decree as follows:

"(d) That the capitalized value of the lands covered by said lease to Sixteenth Section Development Corporation predicated upon the annual rental income from said lands for the past five years amounts to approximately $77.72 per acre.

"(e) That the capitalized value of said land covered by said lease after the construction of the proposed reser-

voir thereon will amount to approximately $1200.00 per acre.

"(f) That the proposed use of said land for a reservoir as disclosed by the evidence constitutes the highest and best use to which the land could be put by Hinds County for the benefit of the school fund of Township 6 North, Range 1 East of said county.

"(g) That the proposed use to which said land would be put by the construction of said reservoir does not constitute legal waste.

"(h) That the proposed use to which said land will be put by the construction of said reservoir will increase the value of the inheritance.

"(i) That the proposed use of said land as a reservoir as disclosed by the evidence and as approved by the Board of Supervisors of Hinds County and by the Superintendent of Education of Hinds County, Mississippi, is for the best interest of Hinds County and the township school fund of Township 6 North, Range 1 East, of Hinds County, Mississippi."

We are of the opinion that under the circumstances and facts of this case the chancellor's decree was supported by substantial evidence, was manifestly correct, and should be affirmed.

In Cause No. 40,740, which was filed to confirm the lease under Sections 6616 and 6617 of the Code of 1942 as amended, we find that the order of the board of supervisors complied with all the requirements of the law and the decree confirming same should be affirmed.

It follows that the judgment of the court below in both cases is affirmed.

Affirmed.

*McGehee, C. J.,* and *Roberds, Hall, Lee, Holmes* and *Gillespie, JJ.,* concur.

KYLE, J., dissenting:

I am unable to concur in the majority opinion in this case.

The land involved in this suit is sixteenth section school land, title to which is vested in the state in trust for the benefit of the school children of the township. The land is arable land lying immediately north of Northside Drive in the City of Jackson. Approximately one-fourth of the land is situated inside the corporate limits of the city. The land is bounded on the east and south by thickly populated and rapidly growing residential areas. A public elementary school is located on the land adjoining the 470 acres involved in this suit. The entire sixteenth section is cleared, and most of the land has been used heretofore for agricultural purposes. The land is well suited for residential and industrial uses, and because of its location and suitability for such uses the land itself is probably the most valuable sixteenth section land in the state. The appellee Development Corporation is a mere lessee of the 470 acres mentioned above for a term of 25 years.

It is not claimed here that the state, through its legislature or any other authorized state agency, has ever consented to such destruction of the land area and such material alteration of the freehold of sixteenth section land as is proposed to be done here; and in my opinion no such material alteration can be made legally without legislative authority, and if made without legislative authority, such alteration will constitute waste for which the Development Corporation will be legally liable. No court, so far as I have been able to find, has ever held prior to this decision that a lessee for a term of years has the right to convert a large body of arable land, theretofore used for agricultural purposes, into a reservoir designed to provide industrial water for a generating plant located on adjoining lands without the express consent and approval of the owner of the fee.

Section 211 of the State Constitution, as amended (Ch. 343, Laws of 1944), provides that, "The Legislature shall enact such laws as may be necessary to ascertain the true condition of the title to the Sixteenth Section lands in this state, or lands granted in lieu thereof, in the Choctaw Purchase, and shall provide that the Sixteenth Section lands reserved for the support of township schools shall not be sold nor shall they be leased for a longer term than ten years for lands situated outside municipalities and for lands situated within municipalities for a longer term than 99 years, for a gross sum; * * * but the Legislature may provide for the lease of any of said lands for a term not exceeding twenty-five years for a ground rental, payable annually, * * *." The legislature, in Section 6597-02, Code of 1942, as amended, has provided that, "The board of supervisors of the county in which sixteenth section lands are situated may, in its discretion, elect to lease any of such lands, whether within or without the municipality, for a term not exceeding twenty-five (25) years for a ground rental, payable annually, * * *." The Development Corporation in this case holds under a lease made by the board of supervisors pursuant to the authority conferred upon the board in that section.

In discussing the rights acquired by the lessee of sixteenth section lands under a similar statute, the Court in Moss Point Lumber Company v. Board of Supervisors of Harrison County, 89 Miss. 448, 42 So. 290, 873, said: "There is no authority given in the statute to do anything but lease this land. No person reading this statute could possibly be misled into the supposition that he was getting a fee, when the statute said that it should be a lease, and when the conveyance made by the trustees only purported to be a lease. The very purpose of the legislature in saying that the land should be leased was to measure certainly the rights which every party taking the lease should get by the kind and character of con-

veyance which they authorized to be made to him. A lease has an accurate, definite, certain legal meaning, and by this legal meaning the rights of the lessees under this statute must be measured. Because this is public land, and because the lease is for ninety-nine years, and because the parties authorized by law to make the lease are public officers, no greater or different rights were conveyed by the lease than if it had been made by private parties for a number of years.''

The Court in its opinion in that case also quoted with approval the statement made by Justice Sharkey in Dillingham v. Jenkins, 7 Smedes & M., 479, that, ''A lease of ninety-nine years is of no higher dignity than a lease for a term of one year.'' And turning then to the question as to whether or not a tenant for years is liable for waste, the Court said:

''We now turn our attention to the question as to whether or not a tenant for years is liable for waste. Independently of the statutes of Marlbridge and Gloucester, and independently of whether or not they form a part of our common law, we think this question is as firmly settled and buried in our jurisprudence as any principle of natural right can sink itself in the jurisprudence of any state. Whenever this question has arisen in this state it has been decided in the affirmative. It was so decided in the Gans case, 80 Miss. 76 (s.c., 31 South. Rep., 539); Walton v. Lowrey, 74 Miss., 487 (s.c., 21 South. Rep., 243); Learned v. Ogden, 80 Miss., 769 (s.c., 32 South. Rep. 278; 92 Am. St. Rep., 621); Cannon v. Barry, 59 Miss., 289. The Gans case is the most recent and accurate announcement of this principle. The question cannot be considered an open one in this state. Any tenant for years, it matters not how many years his tenancy may run, is liable for waste when he does those acts which are defined as waste, determined by the conditions and circumstances which exist at the time when the acts are committed. Any contrary holding would

shock common understanding of the law. It may be stated that it is a universal rule in this country that, unless exempted by the terms of the lease from responsibility for waste, a tenant is responsible for voluntary waste, whenever committed."

Thompson in his work on Real Property, Permanent Edition, Vol. 2, p. 524, par. 816, defines the word "waste" as follows:

"The word 'waste' may be briefly defined as the doing of those acts which cause lasting damage to the freehold or inheritance, or the neglect or omission to do those acts which are required to prevent lasting damage to the freehold or inheritance. * * *. 'Waste' has also been defined as the destruction or material alteration of any part of the tenement by the tenant for life or for years to the damage of the person entitled to the inheritance; an illegal act or an omission of duty on the part of the tenant resulting in permanent injury to the inheritance; and as any spoil or destruction committed or permitted with respect to lands, houses, gardens, trees, or other corporeal hereditaments by the tenant thereof to the prejudice of the remainderman or reversioner. It is a destruction or material alteration or deterioration of the freehold, or of improvements constituting a material part thereof, by a person who is rightfully in possession but who does not have the fee title or the full estate." See also cases cited.

The general nature and extent of the tenant's right of possession of leased premises is stated by the text writer in 32 Am. Jur., 189, Landlord and Tenant, par. 201, as follows:

"Where a lease is general in its provisions and terms and expresses nothing as to the mode in which the lessee is to use or occupy the premises, he is clothed with full power and right to occupy and use the land demised in the same manner that the owner might have done and for any lawful purpose or business which does not in-

jure the reversion, but his use must not constitute waste or a nuisance, * * *. The relation of landlord and tenant implies that the tenant, while using the property, will exercise reasonable care to prevent damage to the inheritance, * * *. He must use the premises in a tenant-like manner or, in other words, husbandlike manner, so that they will revert to the landlord in the same general condition in which they were at the time of the letting, subject to such general deterioration as is caused by a reasonable use and the lapse of time. On the other hand, a particular use of the premises is not wrongful merely because it causes damage to the reversion, provided the damage is ordinary or reasonable wear and tear.''

As to the kind of injuries to the reversion for which the landlord may sue, the text writer in 51 C. J. S., 902, Landlord and Tenant, par. 260, says:

''An injury to the reversion for which the landlord may sue may consist inter alia in the removal or destruction of a fence, the flooding of lands, the diversion or obstruction of a natural watercourse, the cutting of timber, the burning of standing timber, the partial destruction of a house, the maintenance of a nuisance, the removing of stone or gravel, the construction of a drain, the erection of an elevated railroad, the obstruction of ways, and other like acts.'' And as to the duty of the tenant to refrain from any act that may result in substantial injury to the leased premises, the same text writer, in par. 261, says: ''By a demise from a landlord to a tenant, a covenant is raised, by implication of law in the absence of express covenants in reference thereto, that the tenant shall so use the demised property that no unnecessary or substantial injury shall be done to it. * * * A landlord may maintain an action against the tenant for an injury to the reversion, where the tenant has made alterations or changes which materially change the nature and character of the property, even though the value of the property is not thereby diminished, and not-

withstanding the alteration is beneficial to the reversion.''

The lease contract in the case that we have here was executed by the president of the board of supervisors and the Development Corporation on June 21, 1957. The term of the lease is 25 years. The lease provides for the payment of a ground rental of $8,000 per year. On the same day the lease contract was signed the Development Corporation entered into a written contract with the Mississippi Power and Light Company for the construction of a reservoir by the Development Corporation on the leased premises, the waters of which were to be used by the Power Company for industrial purposes in connection with the operation of its electric generating plant located immediately west of. the leased premises. The contract between the Development Corporation and the Power Company, which appears as a part of the record in this case, provides in detail the method to be pursued in financing the project by the issuance of bonds, the payment of which is to be guaranteed by the Power Company, and the contract provides for the payment of substantial rental by the Power Company to the Development Corporation, which it is estimated will be sufficient in amount to pay the principal and interest of the bonds as they mature, and also the cost of maintenance of the reservoir and the annual rentals required to be paid by the Development Corporation into the township school fund. Although it is claimed by the officials of the Development Corporation that the proposed lake or reservoir is intended to provide the public with swimming, fishing, boating and other recreational facilities, it is clear that the rights of the Power Company in the use of the waters of the reservoir are to be paramount, and that the primary purpose for which it is to be constructed is to afford to that company a supply of water for industrial uses. It is expressly stated that the Power Company shall have the right to treat the water in any

way necessary to make it suitable for industrial use, and if necessary, to destroy plant and animal life therein.

The reservoir to be constructed is designed to have a water area of approximately 400 acres, with an average water depth of 15 feet and a maximum water depth of 30 feet. In order to contain the waters within the reservoir, the plan provides for the construction of a dam or levee approximately 2½ miles in length, with a maximum height, at its highest point, of 35 feet. The plan also calls for the excavation of a canal more than three-fourths of a mile in length, varying in width from 20 to 300 feet, and in depth to a maximum of 40 feet below the present level of the land. The Livingston Road, a main thoroughfare running north and south through the center of the section, and intersecting Northside Drive at a point inside the city limits is to be closed and submerged under the waters of the reservoir for the greater part of its length. To construct the reservoir, the retaining dam or levee, and the canal, it will be necessary to remove from the reservoir area approximately 1,500,000 cubic yards of earth, which will be dumped along the outer edges of the reservoir and be made a part of the embankment. It is undisputed that the proposed reservoir and all its appurtenances are intended as a permanent structure.

It is obvious from a reading of the testimony of the witnesses and the above mentioned contract itself that the purpose and intention of the appellee corporation is to put the sixteenth section land embraced within its lease to a use which is vastly different from any heretofore contemplated or authorized by the legislature; and to carry out that purpose the appellee corporation proposes to change the natural configuration of the land and to make such material alterations in its physical features as will change the character of the land entirely and the uses to which the land may be put at the termination of the lease period. The top soil of the 400 acres is to be

carted away and used in the construction of a retaining wall for the reservoir. The canal mentioned above, which is to be three-fourths of a mile in length, is to be dug, not as an aid to the natural drainage of the land, but for the use of the Power Company in the operation of its generating plant located on other land. What is to be done here will effect a complete change in the identity of the property, and will destroy its value for residential and industrial uses; and the lessee has no intention to restore the property to its original condition at the expiration of the lease term, or to pay compensation for the injury done to the reversion. In my opinion, such acts, if done without legislative authorization, will constitute waste under all of the authorities.

In 44 Words and Phrases, Permanent Edition, pp. 704, 705, we find the following definitions of "waste":

" 'Waste' is a permanent or lasting injury done or permitted to be done by the holder of a part of it to the inheritance, or to the prejudice of one who has an interest in the inheritance. Mudge v. West End Brewing Co., 125 N. Y. S. 15, 20, 68 Misc. 362."

" 'Waste' is a destruction or material alteration or deterioration of the freehold, or of the improvements forming a material part thereof, by any person rightfully in possession, but who has not the fee title or the full estate. Hayman v. Rownd, 118 N. W. 328, 329, 82 Neb. 598, 45 L. R. A., N. S., 623."

" 'Waste' is an improper destruction or material alteration or deterioration of the freehold, or of things forming an essential part of it, done or suffered by a person rightfully in possession as tenant, or having but a partial estate, like a mortgagor. Hamilton v. Austin, N. Y., 36 Hun, 138, 143."

" 'Waste' is improper destruction or material alteration or deterioration of freehold, or thing forming an essential part of it, done or suffered by persons rightfully in possession as tenants, or having but partial estate

like mortgagor. * * * . Cottle v. Wright, 251 N. Y. S. 699, 701, 140 Misc. 373.''

In United States v. Bostwick, 94 U. S. 53, 24 L. Ed. 65, the Court held that a tenant for years, even though it be the United States government, takes its lease subject to an implied covenant not to commit voluntary waste or to suffer to be committed. In that case Thomas R. Lovett, trustee of Mrs. Louisa Fletcher, sued the United States to recover rent for and damage to certain real estate and premises situated in the District of Columbia, which Lovett had agreed to let and United States to hire, for the term of one year, with the privilege of three, at a rental of $500 and without restriction as to the use to which the property might be put. The Court held that the property having been rented by the United States for all purposes no recovery could be had on account of its being used for a smallpox hospital, and that the United States was not liable for damages done by the Army engaged in the suppression of the rebellion before the lease commenced, but that the United States was liable for the destruction of ornamental trees, fences, walls etc., and the quarrying and removal of stone and gravel during the occupancy under the lease. The Court in discussing the liability of the lessee under the lease said: ''The United States agree to nothing in express terms, except to pay rent and hold for one year. But in every lease there is, unless excluded by the operation of some express covenant or agreement, an implied obligation on the part of the lessee to so use the property as not unnecessarily to injure it, or, as it is stated by Mr. Comyn, 'to treat the premises demised in such manner that no injury be done to the inheritance, but that the estate may revert to the lessor undeteriorated by the wilful or negligent conduct of the lessee.' Com. Land & Ten. 188. This implied obligation is part of the contract itself, as much so as if incorporated into it by express language. It results from the relation of landlord and tenant between the parties which the contract creates.''

In the case of Cannon v. Barry, 59 Miss. 289, the Court held that a purchaser of the life estate, who, at the instance of the life tenant, removed the running gear from the gin, and permitted the gin house to be partially dismantled, even without his knowledge was guilty of voluntary waste. In Warren County v. Gans, 80 Miss. 76, 31 So. 539, the Court held that a tenant for years who cut standing timber on sixteenth section school land for sale, and not for necessary estovers or for clearing so much of the estate as a prudent owner in fee would clear for cultivation, was guilty of waste. In Learned v. Ogden, 80 Miss. 769, 32 So. 278, the Court held that a tenant by the curtesy was without right to sell for mere profit trees growing on the inheritance, and that his vendee who cut and removed the same was liable in trespass to the reversioners.

In Moss Point Lumber Co. v. Harrison County, 89 Miss. 448, 42 So. 290, 873, the Court held that a conveyance by the board of supervisors of sixteenth section school land, under Code 1880, Sec. 732, authorizing the same for a term of ninety nine years, was, under the statute, a mere lease, the estate conveyed a leasehold, governed by the principles applicable to estates for years, and it did not give a right in the fee. The Court in that case also held that a tenant for years, unless exempted by the terms of his lease, is liable for waste as an incident of the character of his estate, without reference to the number of years his tenancy may run.

The basis of the Court's holding in this and other cases that the lessee of the sixteenth section lands cannot cut the merchantable timber or drill for oil and gas, and that to do so is waste, is that the cutting of the merchantable timber or the drilling for oil and gas would work a permanent injury to the freehold or inheritance; and such waste cannot be committed in the absence of a specific license granted under legislative authority.

In Yazoo & M. V. R. Co. v. Sultan, 106 Miss. 373, 63 So. 672, the Court held that without authority from his land-

lord, a tenant has no right to construct a ditch on the rented property, and that a lease providing that the tenant should keep all ditches open and ditch banks clean, gave no such right as such provision only referred to ditches already constructed.

In Pace v. State, ex rel. Rice, Attorney General (1941), 191 Miss. 780, 4 So. 2d 270, the Court held that a life tenant has no interest in or right to open and work new mines not in operation at the time the life estate vests, since to do so would amount to the commission of "waste" as a lasting injury to the inheritance; and that, as respects injuries to the reversion, the rights of a tenant under a lease for a term of one or more years can be no greater than those vested in a tenant for life. The Court in that case also held that the state did not part with title to any oil and gas under sixteenth section lands when 99-year agricultural leases of such lands were executed, since such leases created, as between the state and the lessees, the mere relation of "landlord and tenant"; and that the township school trustees, in executing 99-year agricultural leases to sixteenth section lands were without power to "waive" the right of the state, as trustee, to go upon such lands in the future and utilize any source of revenue that might be derived therefrom not disposed of by such agricultural leases.

In Sparkman v. Hardy (1955), 223 Miss. 452, 78 So. 2d 584, the Court held that any substantial injury done to the inheritance, by one having a limited estate, during the continuance of such estate constitutes waste, and that any material change in the nature or character of a building, even though it may enhance the value amounts to waste rendering the tenant liable. But the court also held that, if the changes are only such temporary changes as are consistent with and proper for the utilization of the leased premises and do not affect the four walls, the foundation or the roof of the building, and the former status can be restored at the expiration of the lease term at a small cost, such changes do not amount to waste.

In the case of Potomac Dredging Co. of Baltimore City v. Smoot, 108 Md. 54, 69 A. 507, the Court held that dredging and carrying away sand and gravel by a life tenant from the shore of land bordering on a stream, and the removal of fast land and trees above high water mark, was an injury to the inheritance and constituted waste. The Court in its opinion in that case said: "It is apparent from the record that Charles B. Boswell, at the time he made the lease to Cameron under which the plaintiff company claims, had a mere life estate in the farm as tenant by the curtesy. Conceding his right to alien his life estate by deed or lease, he could not lawfully commit waste on the land nor could he by any form of conveyance authorize anybody else to do so. Tiedeman on Real Property, Secs. 72-75; Williams on Real Property, 24: 30 A. & E. Encyl. 234; Barton Coal Co. v. Cox, 39 Md. 1, 17 Am. Rep. 525; Stonebraker v. Zollickoffer, 52 Md. 154, 36 Am. Rep. 364; Simmerman v. Shreeve, 59 Md. 357. Dredging and carrying away sand and gravel even from the shore of the land, to say nothing of removing the fast land and trees above highwater mark, as the plaintiff asserts the right to do and the evidence shows that it has done, unquestionably injure the inheritance and constitute waste. For such conduct the lease from Boswell under which it claims can afford no warrant or furnish any title on which to base an application for an injunction to prevent interference."

In the case of White Plains v. Griffen, 169 Misc. 706, 8 N. Y. 2d 32 (1938), the Court held that owners' removal of top soil from premises incumbered by tax liens constituted "waste;" and that under a statute authorizing the issuance of a restraining order if the defendant commits waste upon "or does any other damage to" property involved in an action concerning realty, where the owner's removal of the top soil from the premises affected by tax liens would materially reduce the municipality's security for the payment of unpaid taxes, the mu-

nicipality was entitled to a temporary injunction to restrain waste in an action for foreclosure of tax liens. (Civil Practice Act, Sec. 981).

The Court in its opinion in that case said: "The papers justify the conclusion that the cost of replacement of such soil would be many times the amount to be received by the owners. * * * That the contemplated removal of this top soil will constitute a damage to the property is clearly apparent. The plaintiff comes squarely within the provisions of the statute and is entitled to a temporary injunction accordingly."

In Cosgriff v. Dewey, 164 N. Y. 1, 58 N. E. 1, 79 A.S.R., 620, the Court held that a cotenant in possession who, without the authority or consent of his cotenants, quarries rock from the premises, crushes it, and sells it at a large profit, retaining the proceeds, is liable to account to his cotenants for the rock thus taken. Such rock is not the product of the land, but part of the land itself, and to the extent that it is taken operates as a diminution of the estate.

The Court in its opinion in that case said: "The term 'waste', when applied to a tenant in common, for life, or for years, has a very extensive meaning. It includes the opening of new mines upon the land to procure and carry away metals, coal, gravel, stone, or the like. So taking away the soil is waste, even though the purpose is to convert it into bricks for sale, and it has been held that a tenant in common who quarries stone from the common property is guilty of waste. So, also, is the taking of petroleum by one of the joint owners from the common property. Waste need not consist of loss of market value. It may be an actionable injury in the sense of destroying identity."

In the case of Fawn Lake Ranch Co. v. Cumbow, 102 Neb. 288, 167 N. W. 75, the Court held that the removal of minerals from land lessens the value of the inheritance, and constitutes waste, which is forbidden by the

terms of the school land lease under which plaintiff claims and by the statute relating to school lands. The Court in that case defined "waste" as follows:

" 'Waste', in short, may be defined to be whatever does a lasting damage to the freehold or inheritance, and tends to the permanent loss of the owner in fee, or to destroy or lessen the value of the inheritance; any act which tends to diminish the estate and cause a permanent loss to the owner of the fee constitutes waste."

And, in discussing the powers of the board of educational lands and funds, the Court in its opinion said: "Except for the sale of sand and gravel and the instances mentioned in Section 5855, there is no legislative sanction existing for the sale or disposition of any part of the corpus of the estate. The board of educational lands and funds are trustees for the protection and preservation to the people of this state of the lands granted to it for the benefit of the common schools thereof. Their power to lease, sell or dispose of the same only exists in so far as it is directed or permitted by the Legislature. Until that body has acted no power resides in them to dispose of the property."

If the removal of the running gear from the plantation gin by a life tenant in possession, and permitting the gin house to be partially dismantled, is waste, as this Court held in Cannon v. Barry, supra; if the cutting of timber for sale by the lessee of sixteenth section school land is waste, as this Court held in Warren County v. Gans, supra, and Moss Point Lumber Company v. Board of Supervisors of Harrison County, supra; if the opening of new mines by a life tenant, or a tenant for a term of years, is waste, as this Court held in Pace v. State ex rel. Rice, Attorney General, supra; if drilling for oil and gas by the surface lessee on sixteenth section school land is waste, as this Court held in Pace v. State ex rel Rice, Attorney General, supra; if the making of material structural changes or alterations in a building by the lessee

for a term of years to suit his taste or convenience, without the consent of the landlord, is waste, although the value of the property may be enchanced by the alteration, as this Court held in Sparkman v. Hardy, supra; if the destruction of ornamental trees, fences, walls, etc., and the quarrying and removal of stone and gravel by the United States government during its occupancy of privately owned property under a lease for a term of years, during the War between the States, constituted waste, as the United States Supreme Court held in United States v. Bostwick, supra; if the "soil" of sixteenth section school lands, "the thing out of which crops, annual or perennial, are produced," is the thing which the framers of the Constitution of 1890, in Section 211 thereof, prohibited the sale of, as this Court held in Dantzler Lumber Company v. State, 97 Miss. 355, 53 So. 1: How can it be said that a tenant of sixteenth section school land for a term of years may, without any legislative authority whatever, remove the soil of 400 acres of arable school land and convert the surface area into a reservoir, with an average water depth of 15 feet and a maximum water depth of 30 feet, and dig a canal more than three-quarters of a mile in length, varying in width from 20 to 350 feet and to a depth of approximately 40 feet below the present level of the land, thereby changing the topography and the natural features of the land and destroying its value for agricultural and residential purposes, and yet be held not liable for the commission of waste? How can the holding in this case be reconciled with the long.line of decisions of this Court cited above?

That injury will be inflicted upon the freehold by the doing of the acts proposed to be done here is shown by the contract itself between the Development Corporation and the Power Company, which the Court is asked to approve.

If this land were being taken or damaged for public use under the eminent domain statutes, or as in cases

where drainage districts acquire rights of ways for drainage canals and levee embankments, or as in cases where the Federal government acquires flowage rights for flood control purposes, full compensation would have to be paid by the takers for the rights acquired, including compensation for damages done to the inheritance; and such damages would be paid into a special fund which would be invested under the statutes and the income only would be expended for current operation of the schools in the township. In this way the corpus of the trust fund would be kept intact, and the rights of the school children of future generations would be fully protected. But under the plan which the court is asked to approve in this case no compensation is to be made for the damages inflicted on the 400 acres of land which are to be included in the reservoir or for the land utilized for the construction of the drainage canal.

If the soil of the 400 acres should be stripped to a depth of 15 to 30 feet for the purpose of enabling a duly authorized lessee of the mineral rights to mine and bring to the surface coal, acid iron earth, or other mineral deposits, compensation would be made for the damage done in the form of payments of royalties on the minerals brought to the surface. If the soil of the 400 acres should be disturbed in grading the land for residential and industrial uses, or in the digging of ditches or the building of terraces to insure a uniform drainage of the surface water, or in the laying out of streets and the installation of water lines, such changes would be made for the benefit of the freehold, and no acts of waste would have been committed, for the reason that such acts would be deemed to have been done in the interest of good husbandry, would promote rather than diminsh the permanent value of the property. But what is to be done here is to strip the soil from the 400 acres, not for the purpose of improving the land, but for the purpose of creating a water storage facility, which will hold one billion eight hundred mil-

lion gallons of water, to be used by the Power Company during the 25-year lease period; and the only compensation to be paid to the lessor is the annual ground rental for the 25-year period. Neither the lease itself nor the contract between the lessee and the Power Company provides for the restoration of the land to its natural condition at the termination of the lease; and no payment is to be made for the damage done to the reversion.

The majority opinion cites three cases which it is claimed support the holding of the court in this case, namely, Cannon v. Barry, 59 Miss. 289; Warren County v. Gans, 80 Miss. 76, 31 So. 539, and Moss Point Lumber Company v. Board of Supervisors of Harrison County, 89 Miss. 448, 42 So. 290, 873. But each of those three cases was decided in whole or in part against the contentions made by the lessee. In Cannon v. Barry, the Court held that the defendant had committed waste in detaching from the ginhouse and selling the gin machinery, in suffering the ginhouse to be partially dismantled, and in permitting a large body of the woodland to be sold for unpaid taxes; and the Court directed that the defendant be enjoined from the commission of any further acts of voluntary waste to the detriment of the inheritance. In Warren County v. Gans, the Court held that the county was entitled to recover for the value of the timber which had been cut and removed by the lessee or those acting under him, which had not been cut for necessary estovers or for clearing so much of the estate as a prudent owner in fee would clear for cultivation. And in the Moss Point Lumber Company case the Court held that the board of supervisors was entitled to an injunction enjoining the lumber company from cutting down and using the timber on the sixteenth section school land.

The majority opinion in this case, I think, overlooks three basic principles which are firmly embedded in the law governing the relationship of landlord and tenant:

1. That what the lessee proposes to do here can be done only by the owner of the freehold, or with the own-

er's consent. "The tenant during the term," as Underhill says, "has the use, but not the complete dominion of the property demised to him. For this reason he cannot make permanent changes in its character without the consent of the landlord, though this would increase the value of the property, because the effect of making these changes is to deprive the landlord of his dominion over the property and to compel the landlord to yield his own tastes and inclinations to that of the tenant. A landlord has an absolute right to have his land and house kept in an unaltered state, surrounded by all their old features, landmarks and associations. Hence in determining whether an act of waste has been committed by a lessee on the demised premises, the test is whether the act complained of by the lessor is an act which alters the nature of the thing demised." Underhill, Landlord and Tenant, Vol. II, p. 706, par. 434.

2. That a tenant's action is wrongful, and the landlord, if he has not consented thereto, may maintain an action against the tenant for an injury to the reversion, where the tenant has made alterations or changes which materially change the nature and character of the property, even though the value of the property is not thereby diminshed, and notwithstanding the alteration is beneficial to the reversion." 51 C. J. S., 903, Landlord and Tenant, par. 261.

3. That the title to the land involved in this case is vested in the state, in trust, for the benefit of the inhabitants of the township; that only the legislature can say whether alterations or changes which materially change the nature and character of the property shall be made, and if so under what conditions; and the legislature has never authorized such changes or alterations, or given its consent to such changes or alterations.

Whenever authority to make such material changes should be granted under any circumstances, and if so under what circumstances, and under what conditions, are

matters for the legislature to decide; and until the legislature has acted, in my opinion, no right exists to make such changes.

The rule that the landlord is ordinarily entitled to receive the premises back at the expiration of the lease period in the same general condition in which they were in at the time of the letting, subject to such general deterioration as is caused by a reasonable use and the lapse of time, is firmly grounded in the American Law governing the relation of landlord and tenant, and is in conformity with the decisions of our own Court which have been cited in this opinion. The importance of the rule to the landlord or owner of the future estate cannot be denied. Especially is it valuable and essential to the protection of the owner of farm lands or other property, such as we have in this case, who rents his property for a comparatively short period of time. The owner has fitted his premises for certain uses. The lessee has leased them with full knowledge as to their condition; and in the absence of an express agreement that material changes may be made in the premises, the owner is entitled to receive them back at the end of the term still fitted for those uses; and he may well say that he does not choose to have a different property returned to him from that which he leased, even if, upon the taking of testimony, it might be found of greater value by reason of the change. If the lease be for a long period of time, such as a ninety-nine year lease of school land lying inside a municipality, the rule itself would allow for such changes as may be reasonably necessary for the tenant to make in order that he might enjoy the full benefits of his right of possession during the remainder of the unexpired term.

Finally, it is argued that the removal of the soil and the conversion of the 400 acres of land into a reservoir for the use of the Power Company, as proposed in this case, should not be deemed to constitute waste, for the

reason that it has not been shown that injury would result from the conversion of the land into a reservoir for the purposes stated, since there is testimony of "experts" in the record to show that there will still be a need for industrial water after the expiration of the 25-year lease period; that the fringe of shore land lying immediately adjacent to the reservoir may be used for recreational purposes; and that a revenue may still be derived from these sources for the benefit of the township school fund. But this contention in my opinion is both irrelevant and unsound, for the reasons: First, that, as Judge Mayes stated in the majority opinion on the suggestion of error in the Moss Point Lumber Company case, supra: "Courts do not undertake to deal with speculations of this kind, or reckon with possibilities. They are confined to legal rights, which exist at the time they are called to act on them. Whether or not an act on the part of the tenant is waste is determined by the facts and conditions which exist at the time the act is committed." And, second, that the legislature has never authorized such material alterations to be made, and the lessee has no right to make such alterations without legislative authority.

I think the chancellor erred in denying the relief prayed for in the bill of complaint, and that the decree appealed from should be reversed and judgment entered here directing the issuance of the injunction as prayed for in the appellants' bill of complaint.

*Ethridge, J.*, joins in this dissent.